Argued and submitted January 21, 1987, the decision of the Court of Appeals reversed and judgment of the trial court reversed and case remanded to the trial court for further proceedings August 2, 1988

## HEINO,
*Petitioner on Review,*

*v.*

## HARPER,
*Defendant,*

## HEINO,
*Respondent on Review.*

## (TC A8404-02592; CA A37137; SC S33273)

759 P2d 253

Charles S. Tauman, Portland, argued the cause on behalf of petitioner on review. With him on the petition was Bennett, Hartman, Tauman & Reynolds, Portland.

Duane Vergeer, Portland, argued the cause on behalf of respondent on review. The responses were filed by Thomas Sauberli and Vergeer, Roehr & Sweek, Portland.

GILLETTE, J.

## GILLETTE, J.

We are asked in this case to reconsider the rule of law in Oregon that a person is immune from liability for negligent torts committed against his or her spouse. This court first announced the rule for this state as a matter of common law in *Smith v. Smith,* 205 Or 286, 287 P2d 572 (1955); *see also Apitz v. Dames,* 205 Or 242, 287 P2d 585 (1955), and later followed the rule in *Chaffin v. Chaffin,* 239 Or 374, 397 P2d 771 (1964); *see also Moser v. Hampton,* 67 Or App 716, 679 P2d 1379, *aff'd by an equally divided court* 298 Or 171, 690 P2d 505 (1984). Upon further consideration, however, we now agree with the overwhelming number of jurisdictions which have concluded that the public policy rationale traditionally asserted in favor of a doctrine of interspousal immunity for negligent torts does not support the rule.[1] Accordingly, we hold that the common-

---

[1] Our research shows that the rule of interspousal immunity for negligent torts enjoys the following status in the United States:

A. *Doctrine fully abrogated:*

1. Alabama: *Penton v. Penton,* 223 Ala 282, 135 So 481 (1931).
2. Alaska: *Cramer v. Cramer,* 379 P2d 95 (Alaska 1963).
3. Arkansas: *Leach v. Leach,* 227 Ark 599, 300 SW2d 15 (1957).
4. California: *Klein v. Klein,* 58 Cal 2d 692, 26 Cal Rptr 102, 376 P2d 70 (1962).
5. Colorado: *Rains v. Rains,* 97 Colo 19, 46 P2d 740 (1935).
6. Connecticut: *Brown v. Brown,* 88 Conn 42, 89 A 889 (1914) (intentional tort); *Bushnell v. Bushnell,* 103 Conn 583, 131 A 432 (1925) (negligence).
7. Indiana: *Brooks v. Robinson,* 295 Ind 16, 284 NE2d 794 (1972).
8. Iowa: *Shook v. Crabb,* 281 NW2d 616 (Iowa 1979).
9. Kansas: *Flagg v. Loy,* 241 Kan 216, 734 P2d 1183 (1987).
10. Kentucky: *Brown v. Gosser,* 262 SW2d 480 (Ky 1953).
11. Maine: *MacDonald v. MacDonald,* 412 A2d 71 (Me 1980).
12. Maryland: *Boblitz v. Boblitz,* 296 Md 242, 462 A2d 506 (1983).
13. Massachusetts: *Brown v. Brown,* 381 Mass 231, 409 NE2d 717 (1980).
14. Michigan: *Hosko v. Hosko,* 385 Mich 39, 187 NW2d 236 (1971).
15. Minnesota: *Beaudette v. Frana,* 285 Minn 366, 173 NW2d 416 (1969).
16. Mississippi: *Burns v. Burns,* 518 So2d 1205 (Miss 1988).
17. Missouri: *S.A.V. v. K.G.V.,* 708 SW2d 651 (Mo 1986).
18. Montana: *Miller v. Fallon County,* 721 P2d 342 (Mont 1986).
19. Nebraska: *Imig v. March,* 203 Neb 537, 279 NW2d 382 (1979).
20. New Hampshire: *Gilman v. Gilman,* 78 NH 4, 95 A 657 (1915).
21. New Jersey: *Merenoff v. Merenoff,* 76 NJ 535, 388 A2d 951 (1978).
22. New Mexico: *Maestas v. Overton,* 87 NM 213, 531 P2d 947 (1975).
23. New York: *State Farm Mut. Auto Ins. Co. v. Westlake,* 35 NY2d 587, 364

law rule of interspousal immunity is no longer available in this state to bar negligence actions between spouses.

The facts, as alleged in plaintiff's complaint, present a typical case of interspousal negligence. On May 5, 1982, plaintiff Dorothy Heino (wife) was riding as a passenger in an automobile driven by her husband, defendant Arno Heino (husband). At an intersection in north Portland, husband turned left into the path of an oncoming automobile driven by defendant Harper. The resulting collision injured wife. Wife

NYS2d 482, 324 NE2d 137 (1974).

24. North Carolina: *Crowell v. Crowell,* 180 NC 516, 105 SE 206 (1920).

25. North Dakota: *Fitzmaurice v. Fitzmaurice,* 62 ND 191, 242 NW 526 (1932).

26. Ohio: *Shearer v. Shearer,* 18 Ohio St 3rd 94, 480 NE2d 388 (1985).

27. Oklahoma: *Courtney v. Courtney,* 184 Okla 395, 87 P2d 660 (1938).

28. Pennsylvania: *Hack v. Hack,* 495 Pa 300, 433 A2d 859 (1981).

29. South Carolina: *Pardue v. Pardue,* 167 SC 129, 166 SE 101 (1932).

30. South Dakota: *Scotvold v. Scotvold,* 68 SD 53, 298 NW 266 (1941).

31. Tennessee: *Davis v. Davis,* 657 SW2d 753 (Tenn 1983).

32. Texas: *Price v. Price,* 732 SW2d 316 (Tex 1987).

33. Utah: *Stoker v. Stoker,* 616 P2d 590 (Utah 1980).

34. Washington: *Freehe v. Freehe,* 81 Wash 2d 183, 500 P2d 771 (1972).

35. West Virginia: *Coffindaffer v. Coffindaffer,* 161 W Va 557, 244 SE2d 338 (1978).

36. Wisconsin: *Wait v. Pierce,* 191 Wis 202, 209 NW 475 (1926).

37. Wyoming: *Tader v. Tader,* 737 P2d 1065 (Wyo 1987).

38. District of Columbia: D.C. Code Ann. § 30-201 (1981); *Turner v. Taylor,* 471 A2d 1010 (DC App 1984).

B.  *Doctrine abrogated in specific circumstances:*

1.  Arizona: *Fernandez v. Romo,* 132 Ariz 447, 646 P2d 878 (1982) (automobile accidents).

2.  Georgia: *Harris v. Harris,* 252 Ga 387, 313 SE2d 88 (1984) (husband and wife separated).

3.  Idaho: *Rogers v. Yellowstone Park,* 97 Idaho 14, 539 P2d 566 (1974) (automobile accident).

4.  Nevada: *Rupert v. Steinne,* 90 Nev 397, 528 P2d 1013 (1974) (automobile accident).

5.  Rhode Island: *Digby v. Digby,* 120 RI 299, 388 A2d 1 (1978) (automobile accident); *Asplin v. Amica Mut Ins Co,* 121 RI 51, 394 A2d 1353 (1978) (doctrine inapplicable where one spouse dies as a result of the other's negligence).

6.  Vermont: *Richard v. Richard,* 131 Vt 98, 300 A2d 637 (1973) (automobile accident).

7.  Virginia: *Korman v. Carpenter,* 216 Va 86, 216 SE2d 195 (1975) (wrongful death); *Surratt v. Thompson,* 212 Va 191, 183 SE2d 200 (1971) (automobile

filed a complaint alleging, *inter alia,* that husband was negligent in failing to keep a proper lookout, in failing to keep his automobile under proper control, and in failing to yield the right-of-way.[2] In his answer, husband asserted the defense of interspousal immunity. Based on that defense, he filed a motion for summary judgment. The trial court allowed the motion and entered final judgment in husband's favor. The Court of Appeals affirmed, citing *Moser v. Hampton, supra. Heino v. Harper,* 81 Or App 106, 723 P2d 1082 (1986)(per curiam). We reverse.

We approach this case by first briefly discussing the common-law origins of the *Smith* rule; then we examine its application in the Oregon decisions, after which we extract, examine and analyze each of the public policy considerations that have been expounded for and against the common-law rule. Finally, we state our own analysis that we believe results in a different rule of responsibility for interspousal negligence in Oregon.

## HISTORY OF COMMON-LAW
## INTERSPOUSAL IMMUNITY FROM TORT

This court first was called upon to declare whether the rule of interspousal immunity for negligent torts existed in Oregon in *Smith v. Smith, supra.* In approaching the problem,

---

accident). *But see Counts v. Counts,* 221 Va 151, 266 SE2d 895 (1980) (interspousal immunity barred former husband's recovery against former wife for personal injuries intentionally inflicted on him at her direction).

   C. *Doctrine retained for negligent torts:*

1. Delaware: *Alfree v. Alfree,* 410 A2d 161 (Del 1979).

2. Florida: *Raisen v. Raisen,* 379 So2d 352 (Fla 1979).

3. Hawaii: *Peters v. Peters,* 63 Hawaii 653, 634 P2d 586 (1981).

4. Illinois: Ill Ann Stat Ch 40 § 1001 (Smith-Hurd Supp 1986).

5. Louisiana: L Rev Stat Ann § 9:291 (West Supp 1988). Under this section, a divorced spouse may sue the ex-spouse for personal injuries inflicted during the marriage. *Duplechin v. Toce,* 497 So2d 763 (La App 1986). Also, spouses who are judicially separated may sue each other for torts committed after the separation. *Bondurant v. Bondurant,* 386 So2d 705 (La App 1980).

6. Oregon: *Moser v. Hampton,* 67 Or App 716, 679 P2d 1379, *aff'd by an equally divided court* 298 Or 171, 690 P2d 505 (1984).

  [2] Wife later amended her complaint to allege that she and her husband were separated and had lived apart since 1978. Our disposition of this case does not depend on the fact that the parties are alleged to be separated.

the court said little about the English common-law antecedents of the doctrine, stating only:

> "No judicial decisions need be cited for the proposition that at early common law neither spouse could maintain [an] action against the other for either a personal or a property tort, whether it was committed before or during marriage. The common-law rule of non-liability has been universally recognized. See Prosser on Torts, pp 898 and 899; and McCurdy, Torts Between Persons in Domestic Relation, 43 Harv L Rev 1031, et seq; *Brandt v. Keller*, 413 Ill 503, 109 NE2d 729 [(1952)] * * *."

*Id.* at 288. While this statement was accurate as far as it went, it failed fully to acknowledge how utterly different were the times and circumstances that saw the creation of the rule from those that prevailed when the *Smith* court chose to recognize the rule in Oregon.

The most comprehensive study of the doctrine of interspousal immunity in tort is found in Professor McCurdy's article cited by the court in *Smith: Torts Between Persons in Domestic Relation,* 43 Harv L Rev 1030 (1930). We turn to that article for a brief overview of the origins of the doctrine in England.

> "[At common law a] husband was entitled to his wife's services and earnings whether performed in the home or elsewhere, for himself or another; and the husband was under a duty to support. A married woman had no capacity to sue or be sued alone in her own name, but wherever she had a substantive capacity, or was substantively the holder of a right, or subject to a duty, suit must be brought in the name of husband and wife, and judgment was enforced in favor of the husband or against both husband and wife. In the case of torts committed against a married woman, her legal personality was substantively recognized, and insofar as the tortious act caused injury to a legally recognized interest of the woman herself, it was a chose in action of the woman's [although, as already noted, the husband was entitled to its use and any action for its enforcement had to be brought in his name as well.] * * * [I]nsofar as the injury was to the husband alone, either by depriving him of some interest, such as services and earnings, or by increasing the burden of his duties, such as support, it was a chose in action of the husband's. And the converse is likewise true. A married woman substantively had capacity to commit most torts, but her liability was in a sense suspended

during coverture, and the husband subjected. If she committed a tort during marriage, or committed a tort or contracted a debt before marriage, although the duty was substantively hers, suit must be brought against husband and wife, and judgment could be enforced against property of either * * *."

*Id.* at 1032-33 (footnotes omitted).

The effect of these and related disabilities and reciprocal obligations with respect to the property of either spouse had the cumulative effect at common law of making it impossible for one spouse to be civilly liable to the other for an act that, but for the relationship, would have been an actionable tort. *Id.* at 1033. As McCurdy explained it,

"[w]here the [tortious] act occurred before marriage, a cause of action arose. If the man was the tortfeasor, the woman's right would be a chose in action, which upon marriage the man would have the right to reduce to possession [in himself]. This union in one person of the right-duty relation discharges the duty as a matter of substance, and there is besides the procedural difficulty that the husband would be both plaintiff and defendant. If the woman was the tortfeasor, the man's right would be a chose in action against the woman, whose duty upon marriage would devolve upon the husband as a derivative duty, which would be discharged by union of the right and duty in the same person; and there is the same procedural difficulty. Where the act occurs during coverture, the matter is complicated by other factors[, but the same procedural difficulties would exist throughout, *i.e.,* any such action would feature the husband as both plaintiff and defendant — an unacceptable anomaly] * * *."

*Id.* As the foregoing suggests, it is difficult to state with absolute certainty whether the real impediment to interspousal tort actions at common law was substantive, procedural, or both. It nevertheless is clear that, whatever label is affixed to it, the rule arose out of views of the rights and duties of the parties to a marriage as that institution existed several hundred years ago in a society that viewed the relationship far differently than it is viewed today. To take but one example, a legal system that generally did not even recognize divorce would have no reason to consider the implications of dissolution of marriage without fault.

We think that it is equally clear that to refer to this state of the law, as did the court in *Smith v. Smith, supra,* as

the "common-law rule of non-liability" is an inaccurate over-simplification. The rule did not deny the responsibility of one spouse to make reparation for harm done to the other; it merely regarded the incidents of the relationship of marriage as the answer to the wrong. Where the husband was the wrongdoer, his duty to support the wife already existed; where the wrongdoer was the wife, any action against her had to include her husband as a defendant, and so the claim merged. It remained for the enactment of various Married Women's Property Acts in the nineteenth century to provide the impetus for doing away with the bars to most kinds of litigation between spouses. *See generally Smith v. Smith, supra,* 205 Or at 290-95. Those acts and the other related legislation that proliferated in the last half of the nineteenth and the first part of the twentieth centuries were a reflection of the vastly changed social circumstances since the old rule came into existence. However, and in spite of those changes, which led finally even to the right to vote for women, the old rule of interspousal immunity for negligent torts was found still to be alive when, in 1955, this court first faced the issue. We turn now to a specific discussion of the Oregon experience.

## OREGON CASES DEALING WITH INTERSPOUSAL IMMUNITY FROM TORT

As noted, the question of the existence of interspousal immunity as a part of the common law of Oregon came relatively late to this court. When it came, in 1955, it came in tandem with a case involving an intentional tort committed by one spouse against another. The two cases gave this court an opportunity to announce both the existence of the rule of interspousal immunity for tort and the limitations on the scope of that rule.

The negligence case was *Smith v. Smith, supra.* Like the present case, it involved an automobile accident. The wife alleged that the accident and her resulting injuries were caused by the gross negligence of her husband. This court, after the brief aside already quoted concerning interspousal immunity for tort at common law, then stated that it had the power to change the common law:

> "If then, this action can be maintained, it must be because the common-law rule has been appropriately changed by statute, or should be changed by the court in the exercise of the power

to modify ancient rules of common law by reason of changed social conditions, resulting in a recognizable modification of the public policy of the state."

*Smith v. Smith, supra,* 205 Or at 288.

Having outlined the scope of the inquiry that it felt required to undertake, the court turned first to an examination of whether the legislature had authorized negligence actions between spouses. It recognized that Article I, section 10, of the Oregon Constitution, assured that every person "shall have remedy by due course of law for injury done him in his person, property, or reputation," and that the constitution separately provided, in Article XV, section 5, that

"[t]he property and pecuniary rights of every married woman, at the time of marriage or afterwards, acquired by gift, devise, or inheritance shall not be subject to the debts, or contracts of the husband[,]"

but the court found no basis for concluding that the common-law rule as the court perceived it had been changed by the constitution. *Id.* at 290-91, 295-96.

The court next turned to an extensive examination of the statutory provisions that might be argued to alter or abolish the doctrine. Once again, however, it could find no change. *Id.* at 291-95, 296-300. Having exhausted the constitutional and statutory possibilities, the court turned its attention to existing case law from around the country in order to determine whether changed conditions justified changing the doctrine.

The court began this portion of its opinion by considering each of the cases relied upon by the plaintiff, distinguishing many (but not all) on the grounds that they either involved an intentional tort, or were decided as a matter of statutory construction, or both. *Id.* at 299-306. Finding nothing compelling in the cases relied upon by the plaintiff, the court finally offered its own analysis as to the factors that dictated hewing to the common-law line:

"Influenced by the weighty dissent in *Thompson v. Thompson,* [218 US 611, 31 S Ct 111, 54 L Ed 1180 (1910), a United States Supreme Court case declaring the common law doctrine to be the law of the District of Columbia], * * * some courts have been greatly impressed and have espoused the

admittedly minority view. Clothed in the language of modernity they have heaped criticism upon the ancient.theory that husband and wife are one and have shown no little emotion in the process. They find no disruption of domestic tranquillity when a wife sues her husband for tort. They see no distinction between the criminal prosecution of a husband and the right of the wife to sue him for tort, nor do they see any difference between a wife's right to sue for divorce because of cruelty and her right to sue for damages on account of the same."

*Id.* at 305-6.

Having heaped a measure of scorn on "modernity," the court acknowledged one of modernity's principal spokespersons, Professor Prosser, and quoted his chief criticisms of adherence to the common-law rule:

" 'The chief reason relied upon by all these courts, however, is that personal tort actions between husband and wife would disrupt and destroy the peace and harmony of the home, which is against the policy of the law. This is on the bald theory that after a husband has beaten his wife, there is a state of peace and harmony left to be disturbed; and that if she is sufficiently injured or angry to sue him for it, she will be soothed and deterred from reprisals by denying her the legal remedy — and this even though she has left him or divorced him for that very ground, and though the same courts refuse to find any disruption of domestic tranquillity if she sues him for a tort to her property, or brings a criminal prosecution against him. If this reasoning appeals to the reader, let him by all means adopt it.' "

*Id.* at 306 (*quoting* Prosser, Law of Torts 903-4, § 99 (1941)). The Prosser statement had its intemperate elements, and the court made it clear that the statement had been selected for that reason:

"It would seem that a suit for divorce is brought for the approved purpose of ending the marital status which has already been destroyed. Not so a suit for negligence. One would suggest that in criminal prosecutions the plaintiff is the state, not the complaining witness * * *. The argument to the effect that when a husband has beaten his wife, the peace and harmony of the home has already been destroyed, is a valid one, but it applies with force only to intentional wrongs. We are sure that the learned jurist would not say that the peace and domestic tranquillity of the home is ended every time that a wife is shaken up by the inattentive conduct of her husband

in operating the family automobile, or vice versa. Nor can it be said that domestic felicity has been forever lost if a husband slips on a carelessly oiled kitchen floor."

*Id.* at 307.

The court thus rejected, in a somewhat convoluted way, the argument that permitting such negligence actions would not disrupt domestic harmony because that harmony had been destroyed already. Its analysis consisted primarily of a simple statement of doubt — it was not persuaded. The court then went on to discuss two reasons it felt justified in adhering to the common-law rule, *i.e.,* avoidance of collusive legal actions and the difficulties inherent in making available between spouses whose lives are so intimately intermingled tort actions whose parameters have grown up in a context of legal actions between parties not so intimately connected.

The court saw a substantial danger that permitting interspousal negligence actions would lead to actions that were a fraud on insurance companies:

"Much effort has been expended in attacking the classical theory that protection of the peace and harmony of the home constitutes the basis for nonliability. It would seem that the effect of suit upon marital felicity must depend upon the facts of the particular case. Action by a wife against her husband may conceivably engender great bitterness where it is based on an intentional wrong, or where there is serious and bitter disagreement as to the facts. It is not unusual that the credibility of witnesses is questioned in damage cases. If the action is not truly an adversary one, then the damage to peace and harmony becomes pure fiction. The minority rulings brush aside the risk of collusion by the husband and wife by the simple assertion that the courts know how to deal with collusive suits. But it is obvious that the risk of collusive action increases when the parties plaintiff and defendant are in confidential relationship. The risk of financial loss is ordinarily inducement enough to encourage a sturdy defense. Remove from a defendant the risk of loss and substitute the covert hope of profit and a situation arises which should give us pause. * * * We revere the jury system as the bulwark of individual liberty, but we are also realists, and we know that juries are, as a Kentucky mountaineer once said — 'tolerable generous with other people's money', especially when the aroma of insurance permeates the courtroom. It would seem that if

" husband and wife want protection by insurance, accident policies are available. We do see a substantial risk of miscarriage of justice when, in the peace and harmony of connubial bliss, a wife prepares a damage suit against her husband over the solitary protest of an insurance company."

*Id.* at 310-11.

Finally, the court argued that negligence actions simply are not suited to the special and intimate relationship between spouses:

"One other consideration moves us to leave this issue to the wisdom of the legislature. At least so far as acts of negligence are concerned, courts and writers alike recognize that there are areas of marital intimacy within which actions for negligence should not be allowed, even under the minority rule. Those areas are not, and we think, cannot, be accurately defined. * * * It has also been suggested that the right of action in a wife should be qualified by applying the doctrine of assumption of risk in various cases arising within the purview of the marital relation. To adopt such a hazy criterion * * * would, in our opinion, open the doors to litigation but withhold the assurance of victory in many cases. We are not disposed to carve out the area within which actions for negligence should be allowed, or that other area in which the intimacy of the family relationship forbids recovery by the spouses. * * *

"Finding no clear-cut issue of public policy, and no line of demarcation to which we can hew, we must leave the right of husband or wife to sue the other for negligent tort to the tender mercies of the legislature."

*Id.* at 312, 314.

We have examined the court's reasoning in *Smith* at such length in order to identify fully all the rationales the court found to lead, separately or together — the court did not say which — to its conclusion that the common-law rule should be judicially recognized in Oregon. From this examination, we glean the following rationales: (1) No right of action for negligence has been granted between spouses by the Oregon Constitution or legislative enactment; (2) allowance of such actions would be contrary to the policy of the law to foster tranquility in the marital relationship; (3) allowance of such actions would lead to collusive actions designed to defraud insurance carriers; (4) allowance of such actions

would lead to a great number of cases being brought, far too many of which would involve circumstances so trivial that they should not permit recovery although they technically do involve negligent torts. To these we think there may fairly be added a fifth rationale, never specifically advanced by the court but implicit in its entire examination of the issue: the legislature, which over the years has vastly overhauled the legal relationship of spouses in a number of different ways, has sufficiently occupied this field of the law so that it is appropriate to leave to that body any further adjustments, including adjustments in the capacity of spouses to sue each other.

On the same day that it announced *Smith,* the court also made clear that the common-law incapacity of spouses to sue each other in tort extended only to negligent torts; intentional torts between spouses were actionable. The case announcing this principle was *Apitz v. Dames, supra.*

In *Apitz v. Dames, supra,* the executor of a deceased wife brought an action against the estate of the deceased husband for wrongful death. Husband had intentionally shot and killed his wife and then killed himself. The trial court dismissed the case on the ground of interspousal immunity from tort. The Supreme Court reversed.

The court's opinion (also by the author of the *Smith* decision) is not a model of clarity. In fairness, this may well be due to the fact that *Apitz* was decided the same day as *Smith* so that policy discussions relating to the issues in each case kept impinging on the analysis in the other case. Certainly, there are passages in each opinion which could have resided satisfactorily—perhaps even more comfortably—in the other. There is also the oddity that, while *Apitz* refers to *Smith* on at least five occasions, *Smith* never once mentions *Apitz.* Those points noted, we examine *Apitz.*

The court had two questions to dispose of in *Apitz.* First, it had to determine whether the fact that one or both of the parties to the alleged tort was dead made a difference, *i.e.,* whether the death of either spouse, without more, created a situation to which the common-law rule did not apply. Second, assuming the death of either or both spouses was not relevant, it had to decide whether the rationale for interspousal immunity for negligent torts extended also to intentional torts.

The court concluded that the death of either or both parties was irrelevant. While it was true that the case was one for wrongful death under the "Death Act," OCLA § 8-903, now ORS 30.020, that statute provided that wrongful death actions could be brought only if the plaintiff's decedent could have brought the same action had she lived:

"We think that the Oregon Death Statute means exactly what it says and that the remedy thereby given is available only if the 'former' (the deceased wife) might have maintained an action, had she lived, against the 'latter' (the guilty husband) for an injury done by the same act."

*Apitz v. Dames, supra,* 205 Or at 252.

The court then went on, by way of *dictum,* to discuss at some length a question that might more usefully have been addressed in *Smith:*

"[Another] court [has] argued that the [interspousal] disability 'does not inhere in the tort itself', but the question is whether there is any tort when husband assaults wife. To be sure, there is a crime, but the question remains whether the disability [at common law] was merely procedural or whether under the ancient common-law rule there was no substantive right, i.e., whether there was any 'tort'.

"In a careful review of the early common-law rule, the Supreme Court of Mississippi said:

" '* * * The wife's disability to sue the husband was not alone for the lack of a remedy. That was merely incidental. It was for the lack of any cause of action. Therefore, in order to remove any disability of coverture affecting her right to sue, it was necessary to confer a right of action on her. Giving her a remedy to sue was not sufficient. * * *' *Austin v. Austin,* 136 Miss 61, 100 So 591, 33 ALR 1388.

"To the same effect see the well-considered case of *Wilson v. Brown,* Tex Civ App, 154 SW 322, where it was directly held that there could be no recovery under the death statute unless the deceased could have maintained an action had he not died.

"The following cases indicate that the early common-law rule did not merely disable the wife to sue her husband for tort. It went further and held that actions which between strangers would be tortious, were not torts when committed by husband against wife. That is to say disability was not procedural only. The wife at ancient common law had no cause of action on which to sue. *Harvey v. Harvey,* 239 Mich

> 142, 214 NW 305; *Wright v. Davis,* 132 WVa 722, 53 SE2d 335; *Thompson v. Thompson,* 218 US 611; *Libby v. Berry,* 74 Me 286; *Drake v. Drake,* 145 Minn 388, 177 NW 624; *Kennedy v. Camp,* 14 NJ 390, 102 A2d 595; *Conley v. Conley,* 92 Mont 425, 15 P2d 922; McCurdy, Torts Between Persons in Domestic Relations, 43 Harv L Rev 1030, 1044."

*Id.* at 252-53.

Having stated the foregoing, which would make it appear that the court was going to agree with and adopt the view that the common-law disability was substantive, not procedural, the court's discussion then turned in a different direction and never returned to this one. We are left with the impression that the court believed that the common-law disability was substantive — a discussion, as we have noted earlier, far more important to the outcome of *Smith v. Smith, supra,* where it was not discussed at all, than to *Apitz.*

Concluding that the Death Act permitted the action then before it only if the wife could have maintained the action had she lived, *id.* at 254-55, the court turned to the issue that also concerns us — could the wife have sued the husband for intentionally shooting her if the result had not been fatal? As to this question, the court found the better reasoned authorities to allow such actions.

The court began by reviewing decisions from other jurisdictions holding that the infliction of an intentional tort on one spouse by the other spouse was actionable.[3] Perhaps the most vivid material the court cited came from *Crowell v. Crowell,* 180 NC 516, 105 SE 206 (1920), a case in which a wife sued her husband for assault and battery by infecting her with a venereal disease:

> "Whether a man has laid open his wife's head with a bludgeon, put out her eye, broken her arm, or poisoned her body, he is no longer exempt from liability to her on the ground that he vowed at the altar to 'love, cherish and protect' her. Civilization and justice have progressed thus far with us,

---

[3] In fact, two of the cases whose language was specifically quoted by the court were actions for negligence, not intentional tort. *See Courtney v. Courtney,* 184 Okla 395, 87 P2d 660 (1939); *Brown v. Gosser,* 262 SW2d 480 (Ky 1953). The court recognized this fact but noted, "* * *[W]e are not now prepared to adopt the minority rule in cases of negligent operation of a motor vehicle." *Apitz v. Dames,* 205 Or 242, 257-58, 287 P2d 585 (1955).

and never again will 'the sun go back ten degrees on the dial of Ahaz.' Isaiah, 38:8."

*Crowell v. Crowell, supra,* 180 NC at 524, *cited in Apitz v. Dames, supra,* 205 Or at 259.

Having reviewed the authorities, the court summarized the situation facing it:

"It is undoubtedly true * * * that there is a two-fold basis for the common-law rule of immunity; first, the technical effect of the unity of husband and wife; and second, ancient concepts of public policy inherited from the feudal era whereby it was held that actions between husband and wife must not be permitted because they would destroy the domestic peace and felicity of the home. When it is recognized that the ancient concept of the legal unity of husband and wife has eroded beyond recognition, and when the facts are such that there remains no peace and felicity to be protected, we are impelled to inquire whether it may not be within the function of a common-law court to hold that[,] the basis for the rule of immunity having been removed, the rule itself must fall."

*Id.* at 262-63.

Turning from the case law to the treatises and other writings, the court, somewhat surprisingly, found support and solace in the following now-familiar statement from Dean Prosser:

" 'The chief reason relied upon by all these courts, however, is that personal tort actions between husband and wife would disrupt and destroy the peace and harmony of the home, which is against the policy of the law. This is on the bald theory that after a husband has beaten his wife, there is a state of peace and harmony left to be disturbed; and that if she is sufficiently injured or angry to sue him for it, she will be soothed and deterred from reprisals by denying her the legal remedy—and this even though she has left him or divorced him for that very ground, and though the same courts refuse to find any disruption of domestic tranquillity if she sues him for a tort to her property, or brings a criminal prosecution against him. * * *' "

*Id.* at 264 (quoting Prosser, Law of Torts 903-04, § 99 (1941)). We call the use of this material from Prosser surprising because the same material, with the addition of only one more sentence, was quoted with *disapproval* in *Smith v. Smith, supra,* 205 Or at 306 (discussed *ante* at 356).The court went on

to consider various other writings and found them generally accommodating of the idea of making intentional interspousal torts actionable.

Finally, the court turned to an examination of Oregon precedents, particularly the case of *Cowgill, Adm'r v. Boock, Adm'r,* 189 Or 282, 218 P2d 445 (1950), which held that a minor child could sue his father for an intentional tort. Finding that the precedents, such as they were, supported a rule of liability, the court held:

> "We hold that when a husband inflicts intentional harm upon the person of his wife, the peace and harmony of the home has [*sic*] been so damaged that there is no danger that it will be further impaired by the maintenance of an action for damages and she may therefore maintain an action."

*Apitz v. Dames, supra,* 205 Or at 271.

Thus, after *Apitz* and *Smith,* the state of the common law in Oregon was that a husband or wife was responsible to the other for intentional, but not negligent, torts.

The only other case prior to the present one in which this court spoke to the issue of interspousal tort immunity was *Chaffin v. Chaffin, supra.* There, a wife sought damages for injuries to herself and as administratrix of a deceased child and guardian ad litem of a second child as the result of an automobile accident. The complaint alleged negligence and gross negligence but did not allege an intentional tort. The Supreme Court held that plaintiff did not state a cause of action in either capacity. The court specifically was invited to overrule *Smith v. Smith, supra,* but declined to do so. *Chaffin v. Chaffin, supra,* 239 Or at 390. The court offered no new or different analysis, preferring to rest its position on what it described as the "excellent and exhaustive" opinion in *Smith.* Justice O'Connell, joined in part by Justice Sloan, dissented, arguing that the doctrine of interspousal immunity for negligent torts should be abolished. Neither justice, however, offered an extensive explanation of his reasons. And there the matter has rested in Oregon until today.[4]

---

[4] The issue was before this court one other time on review of the decision of the Court of Appeals in *Moser v. Hampton,* 67 Or App 716, 679 P2d 1379 (1984), but that decision was ultimately affirmed without opinion by an equally divided court. *Moser v. Hampton,* 298 Or 171, 690 P2d 505 (1984).

## IDENTIFICATION AND ANALYSIS OF
## KEY ELEMENTS FAVORING AND OPPOSING
## INTERSPOUSAL IMMUNITY FOR
## NEGLIGENT TORTS

From the foregoing discussion of the Oregon cases, it is possible to set forth the principal competing theoretical arguments advanced for and against retention of the doctrine of interspousal immunity for negligent torts. We do so here in outline form in order to facilitate further discussion and analysis:

*A. Factors Favoring Retention of the Immunity Doctrine:*

1. Maintenance of peace in the marital relationship;

2. Prevention of collusion between parties in litigation;

3. Practical difficulties in applying fully tort principles to a relationship as close and intimate as the marital relationship.

4. The doctrine should be abolished by the legislature, if at all.

*B. Factors Favoring Abolition of the Immunity Doctrine:*

1. Where the tort is intentional, marital harmony is already lost; the same is probably true whenever one spouse is prepared to sue the other;

2. Litigation between spouses on every other kind of legal theory presently is permissible; saving out only negligent torts is neither symmetrical nor otherwise rational;

3. Almost every other jurisdiction has abolished the doctrine.

The foregoing outline of the competing arguments assumes one thing — that the disability at common law was substantive; *i.e.,* that the negligent infliction of harm by a spouse on the person of the other spouse was not a tort. As already indicated, the *Apitz* court seemed to assume as much, although it never got around to explaining itself. The question is important because, if the disability were only a procedural

one imposed by the common-law courts as an incident of those courts' understanding of the consequences of marriage for the separate existence of husband or wife, we could now simply declare — as the *Smith* court ought to have done, in those circumstance — the disability abolished because the reasons for it are no longer present. We turn to that question.

"*Vir et uxor sunt quasi unica persona, quia caro una et sanguis unus.*" Bracton, lib. 5, fol. 416 (also cited as lib. 5, Tract. 5, cop. 25) cited in 2 Coke, The First Part of the Institutes of the Laws of England, § 291 (18th ed, Hargrove and Butler, eds, 1823). And with this "quasi" unity went a disability to sue *inter se*. But what kind of disability? Whatever its nature, Bracton's statement shows that the disability probably already existed in the English common law by the time Columbus landed in the New World. A specific discussion appears in 1 Blackstone, Commentaries on the Laws of England 442-43 (1765):

"By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and *cover,* she performs every thing; and is therefore called in our law-[F]rench a *feme-covert; * * * is said to be covert-baron,* or under the protection and influence of her husband, her *baron,* or lord; and her condition during her marriage is called her *coverture.* Upon this principle, of an union of person in husband and wife, depend almost all the legal rights, duties, and disabilities, that either of them acquire by the marriage. I speak not at present of the rights of property, but of such as are merely *personal.* For this reason, a man cannot grant any thing to his wife, or enter into covenant with her: for the grant would be to suppose her separate existence; and to covenant with her, would be only to covenant with himself: and therefore it is also generally true, that all compacts made between husband and wife, when single, are voided by the intermarriage. A woman indeed may be attorney for her husband; for that implies no separation from, but is rather a representation of, her lord. And a husband may also bequeath any thing to his wife by will; for that cannot take effect till the coverture is determined by his death. The husband is bound to provide his wife with necessaries by law, as much as himself; and if she contracts debts for them, he is obliged to pay them; but for any thing besides necessaries, he is not chargeable. * * * If the wife be indebted before marriage,

the husband is bound afterwards to pay the debt; for he has adopted her and her circumstances together. If the wife be injured in her person or her property, she can bring no action for redress without her husband's concurrence, and in his name, as well as her own: neither can she be sued, without making the husband a defendant. [But a wife could be the victim of, and give testimony with respect to, a crime committed by her husband against her.] * * *." (Emphasis in original.)

On the other hand, Pollock and Maitland offer this summary of the law of husband and wife (*'baron et feme'*) in the twelfth and thirteenth centuries:

"If we look for any one thought which governs the whole of this province of law, we shall hardly find it. In particular we must be on our guard against the common belief that the ruling principle is that which sees an 'unity of person' between husband and wife. This is a principle which suggests itself from time to time; it has the warrant of holy writ; it will serve to round a paragraph, and may now and again lead us out of or into a difficulty; but a consistently operative principle it can not be. We do not treat the wife as a thing or as somewhat that is neither thing nor person; we treat her as a person. Thus Bracton tells us that if either the husband without the wife, or the wife without the husband, brings an action for the wife's land, the defendant can take exception to this 'for they are *quasi* one person, for they are one flesh and one blood.' But this impracticable proposition is followed by a real working principle:—'for the thing is the wife's own and the husband is guardian as being the head of the wife.' The husband is the wife's guardian:—that we believe to be the fundamental principle; and it explains a great deal, when we remember that guardianship is a profitable right. * * * [T]he husband's rights in the wife's lands can be regarded as an exaggerated guardianship. The wife's subjection to her husband is often insisted on; she is 'wholly within his power,' she is bound to obey him in all that is not contrary to the law of God, she and all her property ought to be at his disposal; she is 'under the rod.' * * *."

2 Pollock & Maitland, History of English Law 405-6 (2d ed 1898) (footnotes omitted). Later in the same volume, the authors say:

"Another rule that grows dimmer as we trace it backwards is that which denies to the married woman all power of contracting a debt. In 1231 a woman was adjudged to pay a debt for

goods bought and money borrowed by her while she was *coverte;* but stress was laid on the fact that she had quarrelled with her husband and was living apart from him. In 1234 a divorced woman was sued for a debt contracted while the *de facto* marriage endured. * * *." (Footnotes omitted.)

*Id.* at 434.

The foregoing leaves the basis of the common-law disability, as opposed to its existence, obscure. It was still so in nineteenth-century America:

"The legal effects of marriage, are generally deducible from the principle of the common law, by which the husband and wife are regarded as one person, and her legal existence and authority in a degree lost or suspended, during the continuance of the matrimonial union. * * *."

2 Kent, Commentaries on American Law 109 (1827) (citing Coke and Littleton).

For our purposes, perhaps the best analytical tool is to see if the consequences one normally would expect of substantive disability actually existed. If the disability were substantive, one would expect to find that a husband was privileged to treat his wife negligently (or worse) without interference from the law. Unfortunately, the answer is once again less than definitive. It does, however, give some hints. Blackstone notes:

"The husband also (by the old law) might give his wife moderate correction. For, as he is to answer for her misbehaviour, the law thought it reasonable to intrust him with this power of restraining her, by domestic chastisement, in the same moderation that a man is allowed to correct his servants or children; for whom the master or parent is also liable in some cases to answer. But this power of correction was confined within reasonable bounds; and the husband was prohibited to use any violence to his wife * * *. The civil law gave the husband the same, or a larger, authority over his wife * * *. But, with us, in the politer reign of Charles the second, this power of correction began to be doubted: and a wife may now have security of the peace against her husband; or, in return, a husband against his wife. Yet the lower rank of people, who were always fond of the old common law, still claim and exert their antient privilege: and the courts of law will still permit a husband to restrain a wife of her liberty, in case of any gross misbehaviour."

1 Blackstone, *supra,* at 444-45.

If the disability were substantive instead of procedural, why was it possible for a wife to obtain legal restraint of her husband (and he of her)? If, as Blackstone documents, such interspousal restraints from certain kinds of acts — admittedly intentional, but interspousal acts nonetheless — were available, is it not at least as likely that the disability that lies at the heart of this case was a procedural one? We do not need to resolve this issue, which has remained unresolved for centuries, in order to state that the theoretical legal underpinning of the *Smith* decision, that the disability was substantive, is subject to serious question. With this question as to the validity of the underlying assumption of *Smith* in mind, we turn to a consideration of the methodology to be utilized in cases like the present one in which established common law rules are challenged.

## ANALYSIS

■  The issue of how this court should exercise its common-law responsibilities is not as simple as the *Smith* court's approach might suggest. The court in that case followed a four-step process: (1) it found what "the" common-law doctrine had been; (2) it identified the reasons for (*i.e.,* the policy of) the doctrine it had identified; (3) it made its own assessment of the continuing validity of the assumptions underlying that policy; and (4) finding the assumptions valid, it recognized the doctrine's applicability in Oregon. This policy identification and weighing process, however, while familiar, is not the only way courts can or should approach such problems. Cases more recent than *Smith* have demonstrated this court's increasing doubts about the methodology used in cases like *Smith.*

In *Norwest v. Presbyterian Intercommunity Hospital,* 293 Or 543, 652 P2d 318 (1982), this court faced a case of first impression in which a minor child brought an action against a physician and a hospital claiming that the defendants' negligent treatment had permanently disabled the child's mother and that the defendants should be liable for the loss that the mother's incapacitation meant to the child. Although that case was unlike the present one in that there was no prior Oregon precedent, what we there said about methodology is pertinent:

"Novel issues of nonstatutory law, and especially tort claims, pose recurring questions of the sources and methods of law. * * *.

"Discussion of the * * * claim often begins with a statement that such a claim was unknown at common law. This implies that to allow the claim means a change in existing law and therefore places on the plaintiff the burden to show why the law should be changed by judges rather than by legislators. If by 'common law' one means the common law of England and those among its one-time dependencies that continued to follow the decisions of English appellate courts, the statement denying the [existence of the claim at common law may be correct] * * *.

"Whatever may have been assumed in the early years of American law, [however,] the decentralization of private law in our federal system precludes reference to a single American common law [today]. * * *.

"That a novel issue is open to judicial resolution says little about how to resolve it. Analysis often depends on the starting point from which one enters upon it. * * *.

"A number of courts have undertaken to allow or deny [liability of the kind claimed] * * * by assessing numerous arguments of policy and practicality adduced for and against such a cause of action. An examination of these arguments will explain why we do not follow that course."

*Id.* at 545-48 (footnotes omitted).

This court then proceeded to identify the policy considerations that had moved various courts either to accept or to reject the theory of tort liability the minor child was advancing. Many of those decisions referred to "social policy" or "far-reaching results." *Id.* at 549-51. Our response was critical:

"The arguments reviewed in the foregoing opinions and commentary juxtapose different kinds of reasons. Contentions about the character of plaintiff's loss and its compensability by money address facts or assumptions about human beings in society, in our case a society that postulates the dependence of children on their parents and that leaves other services and satisfactions to an economic market. We accept the view that a parent's disablement is likely to mean a painful and possibly permanent psychic injury to a child, although one to be proved in the individual case, and that in principle it is no more or less compensable in money than other psychic

injuries for which damages are allowed. But whatever the opposing psychological and social contentions mean for a legal obligation to compensate a child for incapacitating one of its parents, they cannot properly be 'weighed' against concern about[, for example,] insurance rates, at least not by a court of law. * * *.

"Nor are such contentions about the child's loss commensurable with concerns about the processes of litigation. No doubt there are genuine wrongs that courts are ill suited to set right, and others that do not merit the social costs of litigation. But if these costs are to be the reason for denying an otherwise meritorious cause of action, that is one judgment to be made by legislatures rather than by courts. Courts exist to serve whatever rights people have, Or Const art I, § 10; it is not for them to weigh or 'balance' their own institutional concerns against the merits of such a right. * * *.

"There is another reason not to explain the court's understanding of the existing state of the law by the court's views of desirable social policy. Legislators, unlike judges, may change the law at any time without any demonstration of error, illogic, or incongruity, simply upon changes in personnel and in the political agenda. That is what elections and legislative debates are for. One day's unsuccessful proponents or opponents of a social policy may renew the campaign the next day to change the law. They should be free to debate the merits untrammeled by a court's arguments why its view of the existing law represents the better policy. * * *."

*Id.* at 551-53.

Having rejected the use of "policy" arguments for and against the child's claimed cause of action, this court turned to analogies that had been found by other courts to exist in previously-recognized causes of action, *id.* at 553-58, analyzed those analogies in light of particular difficulties posed by existing Oregon negligence law, *id.* at 558-67, and concluded that no analogy to case law and no right created or recognized by statutory enactment stretched so far as to permit an action of the kind brought on behalf of the minor child in that case. *Id.* at 568-69.

*Norwest* is important not so much for its holding as for its admonition about the inherent limitations in a court's capacity to gauge the weight of competing societal interests dressed up as "policy" considerations, assuming a court's

capacity accurately to identify such interests or considerations in the first place. The admonition even can be said to take on additional force when there already exists an Oregon common-law rule on a subject, so that the argument is over its retention rather than its recognition.

Retention rather than recognition was the issue in *Winn v. Gilroy,* 296 Or 718, 681 P2d 776 (1984). The action was one on behalf of the estates of minor children killed in an automobile accident allegedly caused by the negligence of the driver, their father. The Court of Appeals had affirmed a trial court's dismissal of the action on the strength of this court's decisions in *Cowgill, Adm'r v. Boock, Adm'r, supra,* and *Chaffin v. Chaffin, supra,* both of which had held, *inter alia,* that such actions would not lie. This court reversed.

The analysis in *Winn* followed lines similar to those used in the present case. *Cowgill* and *Chaffin* were analyzed to determine the basis upon which each actually was decided. In *Cowgill,* this court had established a murky "middle ground" with respect to a parent's liability for tortious injury to the person of his child, holding that a parent would be liable for "wilful" or "malicious" conduct, but not for ordinary negligence. *Cowgill, Adm'r v. Boock, Adm'r, supra,* 189 Or at 301. The court was highly divided as to its rationale, however, with two justices concurring by separate opinions and three other justices dissenting. As this court summarized the case in *Winn v. Gilroy, supra:*

> "In short, the *Cowgill* court took parental tort immunity to be a 'general rule,' though the question was new to Oregon. What [the lead] opinion described as 'a question of public policy' was not so much the existence of the rule as its modification in the case before the court. The actual decision held a father liable for damages for the death of his son as a result of the father's intoxicated and 'wilfully' wrongful driving."

*Id.* at 724.

As this court then analyzed the later *Chaffin* case, that case also skipped over the question of a doctrine of parental immunity for negligent infliction of personal injury — the existence of such a doctrine was assumed by the parties — and instead focused on the distinction between such adjectives as "wilful," "wanton" and "gross." Again, too, the court was

significantly divided. The *Winn* court summarized the situation as it stood in Oregon after *Chaffin* this way:

> "Thus, prior Oregon cases on the subject of parent-child tort immunity consist of one decision holding a father liable under a 'modified' rule of parental immunity and one decision rejecting liability in a case in which the parties had not questioned the premise of immunity itself but only the shortcomings of the standards of 'willful' or 'wanton' conduct. Given this inconclusive background, we believe that the current status of the rule is open to further examination."

*Winn v. Gilroy, supra,* 296 Or at 725.

Having questioned the underpinnings of its previous cases, *Winn* then proceeded to examine the experience with the doctrine of parental immunity for negligent injury to minor children in other jurisdictions and the rule stated in the Restatement (Second) Torts § 895G (1979). The court gave the following summary of its review:

> "The older immunity doctrine concerned intrafamily litigation. Most, but not all, of the arguments for immunity concerned the undesirable consequences of bringing a minor child's dispute with a parent into court. These were said to include not only 'disruption of family harmony' but also the financial consequences of such litigation for other members of the family and the parent's awkward position in defending against a claim for the child's injuries where liability would be covered by insurance. Even these reasons for immunity were not of the same kind. Only the first focused squarely on the disruptive effect of litigation as such. Concern that tort liability would shift family resources to the injured child puts in question the substantive rights of the parties, not their settlement by litigation. Additional arguments adduced in favor of parental immunity really concern the scope of parental duties toward a child and discretion in making decisions and acting in the course of those duties. * * *.

> "This confusion of reasons concerning parental duties and privileges with reasons concerning litigation could not withstand analysis when courts began to reexamine parental immunity. The growth of exceptions, including this court's views of the doctrine in *Cowgill* and *Chaffin,* showed that rejection of intrafamily litigation, expressed as 'immunity,' was replaced by drawing substantive lines for parental liability. If immunity from being sued by one's minor child really

rested on the adverse impact of litigation, there was no explanation why it did not bar a child's property or contract claim; and exceptions for tort claims if the parent's tort was intentional or 'wilful,' as in *Cowgill,* could be explained only by assuming as a matter of law that this act already had destroyed the 'peace and tranquility of the home.' *Cowgill, Adm'r v. Boock, Adm'r, supra,* 189 Or at 300, 302. These exceptions and others showed that the court was concerned more with defining the required quality of parental conduct within the domestic setting than with litigiousness, that is to say, with substantive standards of parental duties and privileges more than with immunity from suit. That is the shift of analysis reflected in Restatement (Second) of Torts § 895G."

*Winn v. Gilroy, supra,* 296 Or at 728-29 (footnote omitted).

Following the foregoing analysis, this court turned at last to the question whether the doctrine of *Cowgill* and *Chaffin* should be adhered to. It concluded that the doctrine was erroneous:

"We agree with the Restatement (Second) of Torts § 895G, *supra,* that the proper inquiry concerns the tortious or privileged nature of a parent's act that causes injury to the child, not a special parental immunity from a child's action for personal torts as distinct from other kinds of claims. The assumption of a general common law rule of parental immunity from negligence actions that was stated in *Cowgill* * * * and repeated without challenge in *Chaffin* * * * is negated and superseded by the many decisions since 1964 that have rejected such a general rule."

*Winn v. Gilroy, supra,* 296 Or at 731. The complaint was ordered reinstated.

Finally, in *G.L. v. Kaiser Foundation Hospitals, Inc.,* 306 Or 54, 59, 757 P2d 1347 (1988), this court summarized the rule concerning reconsideration of a court-created rule or doctrine as follows:

"Ordinarily this court reconsiders a nonstatutory rule or doctrine upon one of three premises: (1) that an earlier case was inadequately considered or wrong when it was decided, *see, e.g., Winn v. Gilroy,* 296 Or 718, 681 P2d 776 (1984) (reconsidering parental immunity); (2) that surrounding statutory law or regulations have altered some essential legal element assumed in the earlier case, *see, e.g., Dahl v. BMW,* [304 Or 558, 567, 748 P2d 77 (1988)] (enactment of comparative fault statutes supports re-examination of prior case holding

that failure to wear a safety belt is not a proper defense); *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or 543, 562-67, 652 P2d 318 (1982) (wrongful death law did not alter liability to child if parent survives injury); or (3) that the earlier rule was grounded in and tailored to specific factual conditions, and that some essential factual assumptions of the rule have changed. Without some such premise, the court has no grounds to reverse a well-established rule besides judicial fashion or personal policy preference, which are not sufficient grounds for such a change, *see Norwest,* 293 Or at 553."

As previously noted, the foregoing methodology is completely different from that used in *Smith v. Smith.* It is not surprising therefore that, in spite of our later opinions such as *Winn* and *Norwest,* the parties have argued this case primarily in the older, *Smith* style, *i.e.,* in terms of competing policy considerations, because each was attacking or defending *Smith.* This is not the preferred approach.

### A.  *The Norwest/Winn Analysis*

■  Of the three factors summarized in *G.L. v. Kaiser Foundation Hospitals, Inc., supra,* we think the first factor — that the earlier cases were wrong when decided — applies. As our extended discussion of the *Smith* and *Apitz* cases has indicated, the court in those cases adopted a rule that it understood to be a substantive one of ancient lineage. The underlying assumption — that the rule was a substantive one making one spouse immune from actions by the other for negligent torts — cannot be justified from our reading of the sources considered by the *Smith/Apitz* court.[5] Rather, it seems at least

---

[5] Taking those cases in the order in which they were cited in *Apitz v. Dames,* 205 Or 242, 254, 287 P2d 585 (1955):

1. *Austin v. Austin,* 136 Miss 61, 100 So 591 (1924), was a tort action by wife against husband in which wife *admitted* that she had no right of action at common law.

2. *Wilson v. Brown,* 154 SW 322 (Tex Civ App 1913), was relied on by the *Apitz* court as "well-considered." However, the court in *Wilson* acknowledged that the rule of interspousal immunity from tort action was subject to criticism but, because the rule had been stated in an earlier Texas Supreme Court case, the *Wilson* court concluded that, "whatever may be our views we do not feel justified in declining to accept it as the established law of this state." *Id.* at 324.

3. *Harvey v. Harvey,* 239 Mich 142, 214 NW 305 (1927), was a personal injury case in which the existence of the common-law disability was conceded by the

as plausible to label the disability as a procedural one based on the unity of husband and wife that would have required that the husband appear (as a procedural matter) as both plaintiff and defendant in any such lawsuit. Because the later views of the common law, including those of this court in *Smith* and *Apitz,* were based on what may have been a faulty premise, what we said in *Winn v. Gilroy, supra,* 296 Or at 725, applies here: "* * * Given this inconclusive background, we believe that the current status of the rule is open to further examination."

We begin that further examination by noting that the rule adopted in *Smith,* like that under consideration in *Winn v. Gilroy, supra,* does not appear to address the appropriate question. The true question should be "the tortious or privileged nature" of a spouse's act that causes injury to the other spouse, not a special spousal immunity from an action for personal torts as distinct from other kinds of claims. *Winn v. Gilroy, supra,* 296 Or at 731. As already noted, almost every other jurisdiction in the United States has now rejected the idea that there is a special interspousal immunity for negligent torts.

■ Recognition of the correct question virtually dictates

---

plaintiff. The issue was not analyzed.

4. *Wright v. Davis,* 132 W Va 722, 53 SE2d 335 (1949), contained no independent analysis of the issue involved in this case.

5. *Thompson v. Thompson,* 218 US 611, 31 S Ct 111, 54 L Ed 1180 (1910), was a case of intentional tort. The Supreme Court of the United States, without citation to any authority and without any analysis, declared that at common law spouses were not liable to each other in tort.

6. *Libby v. Berry,* 74 Me 286 (1883), contained no independent analysis of the question involved in this case.

7. *Drake v. Drake,* 145 Minn 388, 177 NW 624 (1920), was an equity action in which a husband sought an order restraining his wife from committing certain intentional torts against him. In holding that he could not maintain such an action, the court appears to have misstated the common law. *See* 1 Blackstone, Commentaries on the Laws of England 444-45 (1765).

8. *Kennedy v. Camp,* 14 NJ 390, 102 A2d 595 (1954), is the only case relied upon by the *Apitz* court that really purports to examine the common law. It relies — without justification, we think — on *Thompson* and *Berry,* but also offers an independent assessment of the status of the wife at common law. However, we do not find it, standing alone, to be persuasive authority that husband and wife could not commit torts against each other at common law.

9. *Conley v. Conley,* 92 Mont 425, 15 P2d 922 (1932), relied — again, we think mistakenly — on *Thompson,* which contained no independent analysis.

its own answer. As things now stand, the only kind of legal action not permitted between spouses is one for negligent injury to the person. Every other kind of action, whether that brought by a spouse as a partner seeking an accounting, as an injured party seeking damages for an intentional tort, or even as an injured party seeking damages for negligent injury to property (as opposed to the person), is available. Cohabitation and other circumstances assumed to accompany the marital relationship may call for different standards of care than that required among strangers, and may require that any action for negligent personal injury be subject to such defenses as privilege, but there is nothing in the relationship that calls for absolute immunity.

Moreover, as was also true in *Winn v. Gilroy, supra,* the Restatement (Second) Torts speaks to the issue. The Restatement rule regarding interspousal torts parallels the rule recognized by this court in the case of parent-child torts. Restatement (Second) Torts § 895F (1979) provides:

"(1)   A husband or wife is not immune from tort liability to the other solely by reason of that relationship.

"(2)   Repudiation of general tort immunity does not establish liability for an act or omission that, because of the marital relationship, is otherwise privileged or is not tortious."

Like the Restatement rule involved in *Winn,* § 895F does not affirmatively create any claim. It simply denies that a status — that of spouse — *bars* any otherwise permissible action. *See Winn v. Gilroy, supra,* 298 Or at 728. The Restatement rule postulates that, because of the nature of the marital relationship, conduct that might be tortious as against a stranger would not be tortious as against one's spouse; considerations similar to such doctrines as consent and privilege may render conduct between spouses nontortious.

## B.   The Policy (Smith) Analysis

As already noted, the parties — unlike this court — have approached this case with a *Smith*-style analysis. Whatever may be said with respect to the premises on which they are based, the arguments require some consideration. We turn now to a brief analysis of the policy arguments advanced in support of retention of the *Smith* rule.

### 1. The rule fosters marital harmony

This argument assumes that abolition of the *Smith* doctrine would encourage enmity between spouses. Would the abolition of common-law interspousal immunity for negligent torts have that effect? There are no studies or other sources or authorities that provide us with a definitive answer to this question, and its answer is one that this court is ill-equipped to posit on its own. *See Norwest v. Presbyterian Intercommunity Hospital, supra,* 293 Or at 551-53.

### 2. Prevention of collusion

The fear of collusion is entirely a product of the relatively recent phenomenon of widely available insurance. But, as this court already has held, the presence or absence of insurance has nothing to do with the substantive obligations one party may have toward another apart from the contract of insurance itself. *Norwest v. Presbyterian Intercommunity Hospital, supra,* 293 Or at 552. This factor is not relevant.

### 3. Practical difficulties

Much is made of the fact that husband and wife live in a relationship so close and so intimate that it guarantees that there will be incidents of negligence by the spouses on a scale unparalleled in any other relationship of life. There is precedent suggesting that such considerations are relevant, *see, e.g., Winn v. Gilroy, supra,* but that precedent stands only for the proposition that "the proper inquiry concerns the tortious or privileged nature of a parent's act that causes injury to the child, not a special parental immunity from a child's action for personal torts as distinct from other kinds of claims." *Id.* at 731. At the same time, however, we recognized in *Winn* that, because of the parental duty to discipline, supervise, and care for a child, an act or omission that would be tortious as to a stranger might not be tortious as to the actor's child. Thus, it was suggested that "a more stringent test" be applied when parental negligence involved the "substandard performance of specifically parental duties." 296 Or at 732. To that end, we agreed with the Restatement rule regarding parent-child torts. *See* Restatement (Second) Torts § 895G.

As already noted, the Restatement rule regarding interspousal torts parallels the rule adopted by this court in the case of parent-child torts. Restatement (Second) Torts §

895F. Because of the nature of the marital relationship, conduct that would be tortious as against a stranger might not be tortious as against one's spouse; considerations similar to such doctrines as consent and privilege may render conduct between spouses nontortious. We think that resort to these doctrines sufficiently alleviates any practical difficulties.

### 4. Other reasons

It also can be argued (although our previous cases did not) that, if the doctrine of interspousal immunity for negligent torts is to be abolished, that action should be taken by the legislature. We reject this argument for the reasons that follow.

Of course, the legislature could abolish interspousal immunity, or change it, or reenact it if changed. Common law decisions do not preclude legislative reaction; they often invite it. Moreover, the legislature has entered the field in a significant way — the statutes contain comprehensive laws relating to marriage, divorce, children and related matters. *See, e.g.,* ORS 108.080 (providing for actions between spouses to enforce property rights). But this is not a matter in which the legislature has purported to pre-empt the field. Both the legislative and judicial branches remain competent to act.

And, while we have competence, we should not hide from our responsibilities on the ground that someone else shares them. The rule we consider today is judge-made. If it is no longer valid or appropriate, it is our responsibility to say so. It must be remembered that any answer we give has substantive effect — deferring to the legislature leaves the present rule in place just as fully as if we had affirmatively declared it for the first time.

Based on essentially the same considerations that motivated this court in *Winn v. Gilroy* to conclude that the rule of parental immunity for negligent personal injury to children should be abolished, we now conclude that the rule of interspousal immunity for negligent personal injury to a spouse also should be abolished. Restatement (Second) Torts § 895F correctly states the law of Oregon.

The decision of the Court of Appeals is reversed; the judgment of the trial court is reversed and the case is

remanded to the trial court for further proceedings consistent with this opinion.