830 A.2d 450

**William E. BOZMAN**

v.

**Nancie L. BOZMAN.**

**No. 105, Sept. Term, 2002.**

Court of Appeals of Maryland.

Aug. 12, 2003.

**462**

John J. Condliffe (Judith Shun–Condliffe of Shub–Condliffe & Phoenix), on brief, for petitioner/cross-respondent.

Robert W. Lazzaro (Heisler, Williams & Lazzaro, L.L.C., Towson, on brief), for respondent/cross-petitioner.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, Chief Judge.

Whether the common-law doctrine of interspousal tort immunity shall remain viable in Maryland is the issue we decide in this appeal. The Circuit Court for Baltimore County dismissed the complaint alleging malicious prosecution filed by William E. Bozman, the petitioner, against Nancie L. Bozman, the respondent,[1] a judgment which the Court of Special Appeals affirmed. We shall reverse the judgment of the intermediate appellate court and, as urged by the petitioner, abrogate the doctrine of interspousal immunity.

## I.

The petitioner and the respondent were married in this State on August 16, 1968. On February 24, 2000, the petitioner initiated divorce proceedings against the respondent. As

---

1. Although both parties filed petitions for writ of certiorari and are, therefore, both a petitioner and a respondent, we shall refer throughout this opinion to William E. Bozman as the petitioner and to Nancie L. Bozman as the respondent.

grounds, he pled adultery. The parties were divorced on March 12, 2001.

Shortly before the divorce was finalized, on January 20, 2001, the petitioner filed in the Circuit Court for Baltimore County a complaint sounding in malicious prosecution against the respondent.[2] In that complaint, which consisted of one count, the petitioner alleged that, as a result of criminal charges, which the respondent brought against him on February 17, 2000, May 3, 2000 and July 19, 2000, he was arrested and charged with stalking, harassment and multiple counts of violation of a Protective Order. The petitioner further alleged that the charges were brought without probable cause, were deliberately fabricated to ensure that the petitioner would be arrested, and were in retaliation for the petitioner's initiation of the divorce proceedings and his unwillingness to make concessions in those proceedings. The respondent moved to dismiss the complaint. She argued, in support of that motion, *inter alia*, that the action was barred based upon the common law doctrine of interspousal tort immunity.

The Circuit Court granted the respondent's Motion to Dismiss, but with leave to amend. Thereafter, the petitioner filed an Amended Complaint. As she had done earlier, the respondent filed a motion to dismiss, relying, also as she had done before, on the doctrine of interspousal immunity. Responding to the motion to dismiss and relying on this Court's decision in *Lusby v. Lusby*, 283 Md. 334, 390 A.2d 77 (1978), in which the Court held that interspousal immunity was not a defense to a tort action between spouses where the conduct constituting the tort was "outrageous [and] intentional," *id.* at 335, 390 A.2d at 77, the petitioner argued that the defense was inapplicable under the facts he alleged; his multiple incarcerations and his being subjected to house arrest were sufficiently outrageous and intentional as to fall within the *Lusby* rule. Altogether, the petitioner claims, as a result of the respon-

---

**2.** The petitioner filed his original malicious prosecution action against the respondent in the Circuit Court for Baltimore County on January 29, 2001. The couple's divorce was finalized on March 12, 2001.

dent's false accusations, that he was incarcerated on five separate occasions, for periods ranging between one (1) and ten (10) days, and placed on home detention, which required that he wear an ankle monitoring bracelet for approximately eight (8) months.

On the same day that a hearing on the motion to dismiss was held, the petitioner filed a Second Amended Complaint. That complaint reiterated the allegations of the earlier complaint as Count I and added a second malicious prosecution count. That second malicious prosecution count alleged that, on February 2, 2001, the respondent filed, against the petitioner, additional charges of violating an *ex parte* order, which although ultimately dismissed, again resulted in the petitioner's incarceration and incurring an expense to be released. As he did in the initial complaint, the petitioner claimed that the respondent fabricated the charges, although, on this occasion, the momentum was different; it was in response to the initial malicious prosecution action and the respondent's inability to "prevail in her position" in the divorce proceedings. The petitioner specifically alleged that the dismissal of the charges referred to in Count II, one of the elements of a successful malicious prosecution action, occurred after the parties were divorced. Thus, he argued that that count was not subject to the interspousal immunity defense.

The trial court granted the respondent's Motion to Dismiss, ruling that the action was barred by the doctrine of interspousal immunity. The petitioner noted a timely appeal to the Court of Special Appeals.

In the intermediate appellate court, the petitioner challenged the trial court's dismissal of Count I of the Second Amended Complaint, arguing that it was error in light of this Court's decision in *Lusby*, because malicious prosecution is an outrageous, intentional tort to which interspousal immunity is not a defense. As to the dismissal of Count II of the Second Amended Complaint, the petitioner submitted that, not only was the conduct outrageous and intentional, but the cause of action for the malicious prosecution alleged in that count arose

after the parties were legally divorced. Consequently, he argues, the doctrine of interspousal immunity is rendered inapplicable to that count, as well.

To be sure, the Court of Special Appeals "questioned the continued viability of" the doctrine of interspousal immunity. *Bozman v. Bozman,* 146 Md.App. 183, 195, 806 A.2d 740, 747 (2002), citing *Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506, (1983). Characterizing it as an "antiquated doctrine" and stating that it "runs counter to present-day norms," *id.,* the intermediate appellate court commented:

"We recognize that the doctrine may serve some practical purpose of preventing spouses from instituting suits in tort as a means of gaining an advantage in pending divorce proceedings or for some other improper reason. We remain unconvinced, however, that retention of this doctrine best reflects the will of the people of this State as evidence by, among other reforms, enactment of the Equal Rights Amendment in 1972."

*Id.* Nevertheless, it recognized that:

"Regardless, we are bound to follow the dictates of the law as it presently exists in Maryland. The law is that interspousal immunity may be raised as a defense to a viable cause of action alleging an intentional tort so long as the tort is not 'outrageous,' as that term is used in *Lusby* and *Doe [v. Doe,* 358 Md. 113, 747 A.2d 617]."

*Id.* at 196, 806 A.2d at 747.

Therefore, the Court of Special Appeals addressed the issue that lay at the heart of the case, as submitted to it, the quality of the respondent's conduct and, more generally, the nature of the tort of malicious prosecution. More specifically, the court considered whether the tort, or at least the conduct that constituted the tort, came within the term, "outrageous," as defined in, and contemplated by, *Lusby.* It concluded:

"Without minimizing in any way the harsh consequences to appellant wrought by appellee's behavior in this case, we cannot say that it is of comparable character to that addressed by the Court in *Lusby.* Appellee's actions in the instant case no doubt caused appellant to suffer significant

humiliation and hardship. But they did not involve extreme violence of the most personal and invasive sort, the threat of death and a display of the means by which to carry out that threat, or the physical and psychic trauma that the victim in *Lusby* endured. We conclude, therefore, that the conduct that underlies appellant's claim of malicious prosecution is not, in and of itself, indicative of the sort of outrageous conduct contemplated by the *Lusby* exception to interspousal immunity."

*Id.* at 197–98, 806 A.2d at 748.[3] Accordingly, the intermediate appellate court held that "malicious prosecution is not so outrageous as to bring it within the narrow exception to the doctrine of interspousal immunity." The court affirmed the trial court's dismissal of Count I of the Second Amended Complaint. *Id.* at 186, 806 A.2d at 741.

Turning to Count II, the intermediate appellate court vacated the trial court's dismissal of that count and remanded the

---

3. Because one of the elements of the tort of intentional infliction of emotional distress, recognized by this Court in *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611 (1977), is that the conduct must be "extreme and outrageous," the Court of Special Appeals relied heavily on this Court's cases addressing that tort. *Bozman v. Bozman*, 146 Md.App. 183, 198–200, 806 A.2d 740, 748–750 (2002). Noting that liability has been found in those cases only " 'where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," ' *id.* (quoting *Harris*, 281 Md. at 567, 380 A.2d at 615, in turn quoting Restatement (Second) of Torts, ch. 2, Emotional Distress, § 46 (1965)), the court cited *B.N. v. K .K.*, 312 Md. 135, 146, 538 A.2d 1175 (1988) ("one who knowingly engages in conduct that is highly likely to infect another with an incurable disease ... has committed extreme and outrageous conduct.") and *Figueiredo–Torres v. Nickel*, 321 Md. 642, 654, 584 A.2d 69 (1991) (a psychologist retained to improve a marital relationship acts outrageously when he facilitates a romantic, sexual relationship with the spouse of a patient). The court also relied on those parent-child immunity doctrine cases, in which a minor child has been the victim of "cruel, inhuman or outrageous conduct at the hands of a parent." *Bozman*, 146 Md.App. at 199, 806 A.2d at 749, quoting *Eagan v. Calhoun*, 347 Md. 72, 75, 698 A.2d 1097 (1997) (father committed voluntary manslaughter of his children's mother); *see Mahnke v. Moore*, 197 Md. 61, 68, 77 A.2d 923 (1951) (father shot child's mother in child's presence, kept the child with the body for six days, then shooting self in front of the child).

case for further proceedings. It explained that the respondent "failed to demonstrate that the parties were married when the cause of action in Count II arose." *Id.*

Both the petitioner and the respondent filed a petition for Writ of Certiorari in this Court. The petitioner's petition sought review of the correctness of the Court of Special Appeals' judgment dismissing Count I of the Second Amended Complaint, both as to the grounds, interspousal immunity, and the standard for defining "outrageous" conduct, to measure whether the conduct met the standard established in *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977).[4] In her cross-petition, the respondent sought review of the propriety of the dismissal of Count II of the Second Amended Complaint.[5]

■ We granted both petitions. *Bozman v. Bozman*, 372 Md. 429, 813 A.2d 257 (2002). We agree with the Court of Special Appeals, that the interspousal immunity doctrine is an antiquated rule of law which, in our view, runs counter to prevailing societal norms and, therefore, has lived out its

---

4. The questions actually presented by the petitioner were:
 "Did the Court of Special Appeals err in affirming the dismissal of Count I of the Amended Complaint and Second Amended Complaint of the Plaintiff alleging malicious prosecution on the basis of interspousal immunity?
 "Did the Court of Special Appeals err in establishing as the standard for defining 'outrageous' conduct the standard established in *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977) for Intentional Infliction of Emotional Distress?"

5. The questions that the respondent presented in her cross-petition were:
 "Did the Court of Special Appeals err in reversing the dismissal of Count II of the Cross–The respondent's Second Amended Complaint when that Count was facially defective in that it failed to allege when the charges giving rise to Count II of the Second Amended Complaint were dismissed?
 "Did the Court of Special Appeals err in reversing the dismissal of Count II of the Cross–Respondent's Second Amended Complaint by focusing upon when the cause of action of malicious prosecution finally accrued (termination of the proceedings in favor of the Cross–Respondent after the parties were divorced) rather that when the charges giving rise to the malicious prosecution claims were brought by Cross–Petitioner (when the parties were still married)?"

usefulness. Accordingly, we shall answer the petitioner's first question in the affirmative and, so, complete the abrogation of the doctrine from the common law of this State. As a result, we need not, and shall not, address the other questions raised by the petitioner's petition or the respondent's cross-petition.

## II.

In the case *sub judice*, the petitioner states that the "fundamental issue before this Honorable Court is whether the doctrine of interspousal immunity should be abolished." (Petitioner's Brief at 6). Thus, the petitioner directly and unapologetically asks us to reexamine our holdings in the line of cases from *Furstenburg v. Furstenburg*, 152 Md. 247, 136 A. 534 (1927) to *Doe v. Doe*, 358 Md. 113, 747 A.2d 617 (2000) and to conclude that the rule of interspousal tort immunity has outlived its usefulness in this State. The petitioner relies on many of the cases cited in *Boblitz*, to be sure, but he bolsters his argument with decisions speaking on the issue filed by our sister jurisdictions since *Boblitz* was decided.

The respondent, not unexpectedly, urges "that this Court [should] defer such drastic and far reaching action [as abrogating the interspousal immunity doctrine] to the legislature of this State ." (Respondent's Brief at 3). Some of the arguments the respondent offers in support of our staying our hand, in deference to legislative action, if any, are reminiscent of those that this Court identified in *Boblitz* as the rationales on which those courts retaining interspousal immunity relied to justify its retention and those courts abrogating the doctrine, fully or partially, addressed, and rejected. She offers six such arguments: Husbands and Wives are Treated Differently by the Law; Status of the Doctrine in other States; Other remedies; Stare Decisis; Boblitz Should Not Be a Springboard.

## III.

The doctrine of interspousal immunity in tort cases is a rule of law existing in the common law of Maryland. *Doe, supra,*

358 Md. at 119, 747 A.2d at 619 ("Prior to *Lusby*, the doctrine of interspousal immunity in tort cases was clearly recognized as part of the common law of this state."). In *Boblitz*, we noted that it is a rule of "ancient origin" and created "exclusively from judicial decisions." 296 Md. at 244, 462 A.2d at 507. "The rule at common law [was] that a married woman cannot maintain an action against her husband for injuries caused by his negligent or tortious act." *David v. David,* 161 Md. 532, 534, 157 A. 755, 756 (1932).

The rationale underlying the interspousal immunity rule has been discussed in our cases. In *David,* the Court stated: "The reason usually given for that rule is the presumed legal identity of the husband and wife." *Id.* at 534, 157 A. at 756, quoting *Philips v. Barnet* 1 QB 436 (1876). A more complete statement of the rationale was provided in *Lusby,* 283 Md. at 338, 390 A.2d at 78–79, with attribution to Blackstone, (1 W. Blackstone, Commentaries, Book 1, Ch. 15, p. 442, 443):

> ' "By marriage, the husband and wife are one person in the law: that is, the very being of legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and cover, she performs everything; and is therefore called in our law french a *feme-covert, foemina viro co-operta;* is said to be a *covert-baron,* or under the protection and influence of her husband, her *baron,* or *lord;* and her condition during her marriage is called *coverture.* Upon this principle, of a union of person in husband and wife, depend almost all the legal rights, duties and disabilities, that either of them acquire by the marriage."

> "He adds, in discussing the consequences of this union of husband and wife, 'If the wife be injured in her person or her property, she can bring no action for redress without her husband's concurrence, and in his name, as well as her own: neither can she be sued without making the husband a defendant.' "

*See also, Boblitz,* 296 Md. at 244, 462 A.2d at 507. The *Lusby* Court, again quoting Blackstone, Book 1, Ch. 15, pp. 444–45,

also addressed another aspect of the relationship between husband and wife at common law, which it characterized as "hard to comprehend":

" 'The husband also, by the old law, might give his wife moderate correction. For, as he is to answer for her misbehavior, the law thought it reasonable to intrust him with this power of restraining her, by domestic chastisement, in the same moderation that a man is allowed to correct his apprentices or children; for whom the master or parent is also liable in some cases to answer. But this power of correction was confined within reasonable bounds, and the husband was prohibited from using any violence to his wife, *aliter quam ad virum, ex causa regiminis et castigationis uxoris suae, licite et rationabiliter pertinet.* The civil law gave the husband the same, or a larger, authority over his wife: allowing him, for some misdemeanors, *flagellis et fustibus acriter verberare uxorem* [to beat his wife severely with scourges and cudgels]; for others, only *modicam castigationem adhibere* [to use moderate chastisement]. But with us, in the politer reign of Charles the Second, this power of correction began to be doubted; and a wife may now have security of the peace against her husband; or, in return, a husband against his wife. Yet the lower rank of people, who were always fond of the old common law, still claim and exert their ancient privilege: and the courts of law will still permit a husband to restrain a wife of her liberty, in case of any gross misbehavior.

" 'These are the chief legal effects of marriage during the coverture; upon which we may observe, that even the disabilities which the wife lies under are for the most part intended for her protection and benefit: so great a favorite is the female sex of the laws of England.' "

283 Md. at 338–39, 390 A.2d at 79. The *Boblitz* Court, too, commented on the effect of the doctrine on women:

"Application of the words interspousal immunity to this ancient rule of law borders on mockery. It would more aptly be called a 'rule in derogation of married women.' Under it the person or property of a woman upon marriage

came under the 'protection and influence' of her husband—for good or ill. She became subservient to his will and fitted with a distasteful yoke of servitude and compelled obeisance that was galling at best and crushing at worst." 296 Md. at 245, 462 A.2d at 507.

Our laws pertaining to the rights of married women were completely revised in 1898, with the enactment of the Married Women's Act,[6] see Ch. 457 of the Acts of 1898, now codified at Md.Code 1984, 1999 Repl.Vol.) §§ 4–203–4–205 of the Family Law Article. It was the effect of the Married Women's Act on this common law impediment to, or prohibition against, married women and, thus, the construction of that Act, that has resulted in the bulk of our jurisprudence in this area. From *Furstenburg* until *Lusby*, without exception, "Maryland would not entertain a suit by one spouse against the other for his or her tort, committed during the marital status." *Tobin v. Hoffman*, 202 Md. 382, 391, 96 A.2d 597, 601 (1953) (applying District of Columbia law, interspousal immunity does not apply where wife sues her husband's co-partner in his individual capacity for a tort he committed by his own hand, albeit,

---

**6.** As enacted, the Act provided:

"Married women shall have power to engage in any business, and to contract, whether engaged in business or not, and to sue upon their contracts, and also to sue for the recovery, security or protection of their property, and for torts committed against them, as fully as if they were unmarried; contracts may also be made with them, and they may also be sued separately upon their contracts, whether made before or during marriage, and for wrongs independent of contract committed by them before or during their marriage, as fully as if they were unmarried; and upon judgments recovered against them, execution may be issued as if they were unmarried; nor shall any husband be liable upon any contract made by his wife in her own name and upon her own responsibility, nor for any tort committed separately by her out of his presence, without his participation or sanction."

Two years later, see Ch. 633, Sec. 19(a) of Acts of 1900, the General Assembly added:

"A married woman may contract with her husband and may form a copartnership with her husband or with any other person or persons in the same manner as if she were a feme sole, and upon all such contracts, partnership or otherwise, a married woman may sue and be sued as fully as if she were a feme sole."

within the ambit of partnership activities). See *Stokes v. Assoc. of Independent Taxi Operators*, 248 Md. 690, 237 A.2d 762 (1968) (suit against husband's employer for injuries wife suffered while a paying passenger in taxicab driven by her husband); *Hudson v. Hudson*, 226 Md. 521, 174 A.2d 339 (1961) (action by wife against husband for injuries sustained in a pre-marriage automobile accident caused by husband's negligence); *Ennis v. Donovan*, 222 Md. 536, 161 A.2d 698 (1960) (third party claim against husband by defendant in negligence action, brought by the husband, as administrator of wife's estate); *Fernandez v. Fernandez*, 214 Md. 519, 135 A.2d 886 (1957) (action by the wife, during period of separation, against husband for replevin); *Gregg v. Gregg*, 199 Md. 662, 87 A.2d 581 (1952) (suit for necessaries by the wife against the husband for period not covered by the award of alimony); *Riegger v. Bruton Brewing Company*, 178 Md. 518, 16 A.2d 99 (1940) (suit by wife against husband's employer for husband's negligence); *David v. David*, 161 Md. 532, 157 A. 755 (1932) (suit by wife against partnership of which husband was a member for injuries sustained on the business premises); *Furstenburg v. Furstenburg*, 152 Md. 247, 136 A. 534 (1927) (suit by wife against husband for injuries sustained in automobile accident caused by husband's negligence). That is because the Court in *Furstenburg*, 152 Md. at 252–53, 136 A. at 536, relying on *Thompson v. Thompson*, 218 U.S. 611, 31 S.Ct. 111,54 L.Ed. 1180 (1910), in which the Supreme Court construed a similar District of Columbia statute, concluded that the Maryland Act "g[a]ve the wife a remedy, by her suit alone, for actionable wrongs which could not theretofore be thus independently redressed," and did not "create, as between husband and wife, personal causes of action which did not exist before the act."

That the Court uniformly applied the doctrine, without exception, did not mean that it did not recognize its flaws. As was pointed out in *Boblitz, supra*, 296 Md. at 251, 462 A.2d at 510, "The opinions in decisions of this Court upon the issue demonstrate that we had misgiving concerning our holdings [relating to the doctrine's applicability] in the line of cases

from *Furstenburg* to *Stokes* ." In fact, the Court did not hesitate to criticize the application of the doctrine and the rationale supporting it. In *David,* 161 Md. at 535, 157 A. at 756, while accepting "the broader sociological and political ground that it [permitting suit for tort between spouses] would introduce into the home, the basic unit of organized society, discord, suspicion and distrust, and would be inconsistent with the common welfare," the Court characterized as "technical and artificial" the ground based on the identity of husband and wife. The Court in *Gregg,* 199 Md. at 666, 87 A.2d at 583 labeled the domestic tranquility rationale for the interspousal immunity doctrine "as artificial as" the unity of husband and wife rationale. Expounding on that theme, it pointed out:

"It applies to a post-bellum situation a theory which is clearly only applicable to conditions prior to the difficulty which caused the bringing of the legal action. After discord, suspicion and distrust have entered the home, it is idle to say that one of the parties shall not be allowed to sue the other because of fear of bringing in what is already there."

*Id.* at 667, 87 A.2d at 583. In *Fernandez,* although not permitting a replevin action to be prosecuted by a wife against her husband, from whom she then was separated, the Court acknowledged "the appeal to reason and convenience" of the contrary rule, 214 Md. at 521, 135 A.2d at 887, and that "the literal language of the [Married Women's] Act authorizes both [a right for the wife to sue her husband for the tort against her person] and [a right to sue him for a tort against her property interest], as well as a right to sue him in contract." *Id.* at 524, 135 A.2d at 889.

Our reluctance to change the common law and, thus, our continued adherence to the interspousal immunity doctrine, was in deference to the Legislature. *Stokes, supra,* 248 Md. at 692, 237 A.2d at 763 (declining to change the interspousal immunity rule and noting that change, if any, would be left to Legislature); *Ennis, supra,* 222 Md. at 542, 161 A.2d at 702 ("We can only repeat that if it be desirable to permit a married woman, under certain circumstances, to sue her husband in tort, this authorization should emanate from the

Legislature, not from the courts"); *Fernandez*, 214 Md. at 524, 135 A.2d at 889 ("Those in the situation of the appellant must proceed in equity until the Legislature sees fit to change the law."); *Gregg, supra,* 199 Md. at 667, 87 A.2d at 583 ("these ancient theories which form a part of the common law have to be followed by us unless they have been changed by legislative action, and the clear import of the decision in the *David* case is that the emancipatory statutes must be strictly construed.").

The first breach of the interspousal immunity doctrine in Maryland occurred with our decision in *Lusby*. There, the wife brought a tort action against her husband for damages. As reported by the Court (283 Md. at 335, 390 A.2d at 77),

"She alleged that while she was operating her motor vehicle on a public highway the husband 'pulled alongside of [her] in his pick-up truck and pointed a highpowered rifle at her.' She attempted to flee by increasing the speed of her car. She claimed that then 'another truck occupied by two (2) men, whose identities are unknown to [her] and who, [t]hereinafter are referred to [in the declaration] as John Doe and Richard Roe, cut and forced her off the road, nearly causing a collision.' ... After she stopped her car, the husband 'approached her automobile with a rifle pointed at her, opened her left door, ordered her to move over, forced his way into the automobile and began to drive the automobile.' They were followed by Doe in the husband's truck and Roe in the second truck. Thereafter, the wife 'was forced to enter [the husband's] truck with [the husband] and Richard Roe.' John Doe drove the wife's vehicle and the second truck was left parked. She alleged that her husband then struck her, 'tore [her] clothes off and did forcefully and violently, despite [her] desperate attempts to protect herself, carnally know [her] against her will and without her consent.' She further claimed that, with the aid and assistance of her husband, both Doe and Roe attempted to rape her. She said that following those events her husband 'and his two companions released [her] and [her husband] told [her] that he would kill her if she informed

anyone of the aforesaid events; and that he has continued to harass and threaten [her].' "

*Id.* at 335–36, 390 A.2d at 77–78. On these facts, the Court held, "under the facts and circumstances of this case, amounting to an outrageous, intentional tort, a wife may sue her husband for damages." *Id.* at 335, 390 A.2d at 77.

In rendering our decision, we stated, having noted the Legislature's inaction with regard to amending the Married Women's Act to ameliorate the effect of the interspousal immunity defense and the purpose of statutory construction in the interpretation of statutes:

"For purposes of our decision here today . . . we need not be involved with statutory construction nor need we be involved with our prior cases other than for dicta appearing in them to the effect that one spouse may not sue another for tort. None of our prior cases has involved an intentional tort." [7]

*Id.* at 357–58, 390 A.2d at 89. Nevertheless, before doing so, and, presumably, to inform the decision, we reviewed all of our cases addressing the interspousal immunity doctrine, *id.* at 340–46, 390 A.2d at 80–82, surveyed the cases on the subject from our sister jurisdictions, *id.* at 346–49, 390 A.2d at 82–84, considered the opinions of the commentators as to the doctrine's viability and justification, *id.* at 350, 390 A.2d at 84–85, and "examined the foundation upon which our [prior] holdings rest." *Id.* at 354–57, 390 A.2d at 86–88.

The review of our cases revealed consistent and uniform application of the doctrine, some questioning of the doctrine's underpinnings and that in none of those cases "has there been an allegation of an intentional tort, much less the outrageous conduct" involved in that case. *Id.* at 352, 390 A.2d at 86. Cases from other jurisdictions, the survey found, reflected a division on the issue of the continued viability of the inter-

---

7. Immediately after stating the holding, however, we had observed that it "represents somewhat of a departure from the earlier decisions of this Court." *Lusby v. Lusby,* 283 Md. 334, 335, 390 A.2d 77 (1978).

spousal immunity doctrine.[8] *Id.* at 350, 390 A.2d at 84. On the other hand, the Court noted, the commentators were near unanimous in their criticism of the common law rule of immunity. *Id.* With regard to the examination of the prior holdings on the subject, the Court said:

> "Much of what Mr. Justice Harlan said in his dissent in *Thompson* could be said by way of analysis of the Maryland act, as Judge Hammond implied for the Court in *Fernan-*

---

**8.** The Court identified five cases in which the common law doctrine of interspousal immunity had been abrogated, in whole or in part, "at the time this problem was before the Court in *Stokes [v. Taxi Operators Assn.,* 248 Md. 690, 237 A.2d 762 (1968) ]." *Lusby,* 283 Md. at 346, 390 A.2d at 82. Two of the cases were from California, one, *Self v. Self,* 58 Cal.2d 683, 26 Cal.Rptr. 97, 376 P.2d 65 (1962), abolished such immunity for intentional torts and the other *Klein v. Klein,* 58 Cal.2d 692, 26 Cal.Rptr. 102, 376 P.2d 70 (1962), abolished it for negligence actions, thus completing the abrogation of the doctrine. The other three cases partially abolished the immunity: *Lorang v. Hays,* 69 Idaho 440, 209 P.2d 733 (1949) (as to an intentional tort); *Apitz v. Dames,* 205 Or. 242, 287 P.2d 585 (1955) (limited to the facts in that case); and *Goode v. Martinis,* 58 Wash.2d 229, 361 P.2d 941 (1961) (intentional tort during the pendency of divorce proceedings, parties legally separated).

After the decision in *Stokes,* the Court identified "a parade of cases" in which the common law as to interspousal immunity was altered, twelve in all, and nine cases in which the common law rule was left intact. Of the former, five, *Brooks v. Robinson,* 259 Ind. 16, 284 N.E.2d 794 (1972); *Beaudette v. Frana,* 285 Minn. 366, 173 N.W.2d 416 (1969); *Merenoff v. Merenoff,* 76 N.J. 535, 388 A.2d 951 (1978); *Maestas v. Overton,* 87 N.M. 213, 531 P.2d 947, 948 (N.M.1975); *Freehe v. Freehe,* 81 Wash.2d 183, 500 P.2d 771 (1972), abrogated the immunity completely, and seven, *Rogers v. Yellowstone Park Company,* 97 Idaho 14, 539 P.2d 566 (1974) (auto negligence cases); *Moulton v. Moulton,* 309 A.2d 224 (Me.1973) (tort occurring prior to marriage); *Lewis v. Lewis,* 370 Mass. 619, 351 N.E.2d 526 (1976) (automobile accident); *Rupert v. Stienne,* 90 Nev. 397, 528 P.2d 1013, 1017 (1974) (motor vehicle accidents); *Bounds v. Caudle,* 560 S.W.2d 925, 927 (Tex.1977) (wilful or intentional torts.); *Richard v. Richard,* 131 Vt. 98, 300 A.2d 637 (1973) (motor tort); *Surratt, Adm'r v. Thompson,* 212 Va. 191, 183 S.E.2d 200 (1971) (motor tort), only partially. The latter cases were: *Burns v. Burns,* 111 Ariz. 178, 526 P.2d 717, 720 (1974); *Short Line, Inc. of Penn. v. Perez,* 238 A.2d 341, 343 (Del.1968); *Bencomo v. Bencomo,* 200 So.2d 171, 172 (Fla.1967); *Ebel v. Ferguson,* 478 S.W.2d 334 (Mo. 1972); *State Farm Mutual v. Leary,* 168 Mont. 482, 544 P.2d 444 (1975); *Thomas v. Herron,* 20 Ohio St.2d 62, 253 N.E.2d 772 (1969); *DiGirolamo et al. v. Apanayage,* 454 Pa. 557, 312 A.2d 382 (1973); *Wooley v. Parker,* 222 Tenn. 104, 432 S.W.2d 882 (1968); *Adams, Adm'x. v. Grogg,* 153 W.Va. 55, 166 S.E.2d 755 (1969).

*dez,* 214 Md. at 524, 135 A.2d 886, when he indicated that the literal language of Art. 45, § 5 would authorize the type of suit we here have before us. . . . *Thompson* was decided nine years before the adoption of the 19th Amendment and *Furstenburg,* eight years after its adoption. One senses in *Thompson* a reluctance to permit change. Certainly Justices Harlan, Holmes, and Hughes, the dissenters in *Thompson,* constituted three of the great minds of the Supreme Court of the United States in 1910."

*Id.* at 357, 390 A.2d at 88 (footnote omitted). Judge Menchine, writing for the Court in *Boblitz,* was more explanatory in stating the result of the Court's examination:

"In capsulation, the opinion in *Lusby, supra,* pointed out (1) the current invalidity of the disabilities imposed upon women by the original rule of law; (2) that the great minds of Supreme Court Justices Harlan, Holmes and Hughes had dissented from the narrow interpretation of the District of Columbia Married Womens [sic] Act in *Thompson v. Thompson, supra;* (3) that Chief Judge Marbury . . . [in *Gregg* ]was rightly critical of the reasons for decision in the early cases; (4) that Judge Hammond's observation . . . [in *Fernandez* ] that the literal language of Article 45, Section 5 would authorize tort actions was quite correct . . . and in accord with the view of the dissenters in *Thompson, supra;* and (5) that since the decision in *Stokes* in 1968 . . . there has been a parade of cases in which courts have altered the previous common law rule."

296 Md. at 272–73, 462 A.2d at 521.

The *Lusby* Court concluded:

"We can conceive of no sound public policy in the latter half of the 20th-century which would prevent one spouse from recovering from another for the outrageous conduct here alleged. There certainly can be no domestic tranquility to be preserved in the face of allegations such as we have before us,"

283 Md. at 357, 390 A.2d at 88 and that:

"We find nothing in our prior cases or elsewhere to indicate that under the common law of Maryland a wife was not

permitted to recover from her husband in tort when she alleged and proved the type of outrageous, intentional conduct here alleged."

*Id.* at 358, 390 A.2d at 89.

The breadth of this holding was in some doubt until it was definitively clarified by this Court in *Doe v. Doe,* 358 Md. at 120, 747 A.2d at 620. Two years after *Lusby,* the Court of Special Appeals, in *Linton v. Linton,* 46 Md.App. 660, 664, 420 A.2d 1249, 1251 (1980) construed our holding in that case to create a narrow exception to the interspousal immunity doctrine, to wit, "whenever the tort committed against the spousal victim is not only intentional, as in assault and battery, but 'outrageous,' as where the errant spouse's conduct transcends common decency and accepted practices." Subsequently, the intermediate appellate court concluded otherwise, construing *Lusby* more broadly as recognizing that the "intentional infliction of a tort, involving property or personal injury, may give rise to a cause of action between spouses." *Bender v. Bender,* 57 Md.App. 593, 601, 471 A.2d 335, 339, *cert. denied,* 300 Md. 152, 476 A.2d 721 (1984). In *Doe v. Doe,* 122 Md.App. 295, 323, 712 A.2d 132, 145 (1998), *rev'd by* 358 Md. 113, 747 A.2d 617 (2000), the court, relying on *Lusby, Boblitz,* 296 Md. 242, 462 A.2d 506, discussed *infra,* and *Bender,* concluded that "interspousal tort suits are now permitted in Maryland in both negligence and intentional tort cases." As indicated, we definitively resolved the issue in our *Doe* decision. We did so by reversing the Court of Special Appeals' decision in *Doe,* pointing out that our holding in *Lusby* was confined to intentional torts that were deemed "outrageous," that "[t]he holding in *Linton,* that *Lusby* did not abrogate interspousal immunity as to all intentional torts, is correct."

Merely five years after *Lusby,* we were asked "to reexamine the interspousal immunity rule ... and to declare that rule to be no longer viable in tort cases involving personal injury to a spouse resulting from the negligence of the other spouse." *Boblitz, supra,* 296 Md. at 244, 462 A.2d at 506. In that case, a wife sued her husband for injuries she sustained almost a year before the marriage, as a result, she alleged, of his

negligence in the operation of an automobile. Pleading the parties' marital status and relying on *Hudson,* the husband moved for summary judgment, arguing that the wife's alleged cause of action had been extinguished by the marriage. *Id.* at 243, 462 A.2d at 506. The motion was granted and we issued the writ of certiorari to review the question previously stated. *Id.* at 244, 462 A.2d at 506. We reversed the summary judgment, in the process abrogating the interspousal immunity rule in this State as to cases sounding in negligence. *Id.* at 275, 462 A.2d at 522. We explained:

> "We share the view now held by the vast majority of American States that the interspousal immunity rule is unsound in the circumstances of modern life in such cases as the subject. It is a vestige of the past. We are persuaded that the reasons asserted for its retention do not survive careful scrutiny. They furnish no reasonable basis for denial of recovery for tortious personal injury. We find no subsisting public policy that justifies retention of a judicially created immunity that would bar recovery for injured victims in such cases as the present."

*Id.* at 273, 462 A.2d at 521. (citation omitted).

We arrived at that holding only after conducting a thorough and exhaustive review of the doctrine of interspousal immunity, including its history and rationale, the impact and effect of the doctrine on women and women's rights, the Maryland cases applying the doctrine and the foundation on which they rested, the application and acceptance of the doctrine in our sister states, and, in particular, the change that has occurred over time in the acceptance of the doctrine by the courts of those States, the views of the legal scholars and the academic community as to the continued viability of the doctrine, and the impact of abrogating the doctrine in negligence cases.

Much of the analysis undertaken by the Court as to the historical description and the historical underpinnings of the interspousal immunity doctrine had already been conducted by the Court in *Lusby,* as was the review of both the effect of the doctrine on women and of the Maryland cases applying it,

albeit some with misgivings. These matters have also been addressed already in this opinion and, for that reason, need not be repeated further. It is sufficient to note, again, the observation that the doctrine was more aptly called a "rule in derogation of married women," because it subjected her and her property to her husband's will, "fitted with a distasteful yoke of servitude and compelled obeisance that was galling at best and crushing at worst," *Boblitz*, 296 Md. at 245, 462 A.2d at 507, and the criticism of the rationale for the continued adherence to the doctrine voiced in *David, Gregg* and *Fernandez.*

To be sure, the Court in *Lusby* considered the extent to which the interspousal immunity doctrine was accepted in our sister states; however, that review was not intended to be an exhaustive survey of all of the decided cases, just those cases that had abolished, in whole or in part, the doctrine before and after this Court's decision in *Stokes*. 283 Md. at 346, 390 A.2d at 82–83. As indicated, that survey revealed five cases, two of which were from California, before *Stokes, id.*, and twelve after *Stokes* was decided. *Id.* at 346–49, 390 A.2d at 83–84. By contrast, the Court identified eight states that continued to adhere to the interspousal immunity doctrine. *Id.* at 349, 390 A.2d at 84. The *Boblitz* Court conducted an exhaustive review of the decisions with respect to the doctrine, finding all 49 states, excluding Maryland, had addressed the issue. 296 Md. at 252, 462 A.2d at 511. Characterizing "[t]he changes occurring since 1965[as] astounding," it reported that twelve (12) States continued to recognize the doctrine, thirty-five (35) States had abrogated the doctrine fully or partially, and in two States, a rule of immunity was imposed by statute. *Id.* Twenty seven (27) of the abrogating States did so fully. *Id.* at 258, 462 A.2d at 514.

Because it was concerned with deciding whether to retain the rule in Maryland, the Court undertook an analysis to determine why the interspousal immunity doctrine, once the long-standing majority rule, was no longer widely favored and why those states applying it were, in fact, now in the minority. For the answer, we reviewed decisions of the minority of

states retaining the interspousal immunity doctrine and those from the states that had abrogated the doctrine fully and partially, focusing on the arguments and justifications offered for the retention or abrogation. Although quoting liberally from only three, *Alfree v. Alfree*, 410 A.2d 161, 162–63 (Del. 1979); *Raisen v. Raisen*, 379 So.2d 352, 355 (Fla.1979); and *Robeson v. Int'l. Indemnity Co.*, 248 Ga. 306, 282 S.E.2d 896, 898 (1981), of the twelve decisions retaining intact the interspousal immunity doctrine, the Court identified, "[f]rom the totality of decisions in the twelve states," six reasons, given by one or more of the twelve courts, for the retention of the doctrine:

"1. The unity of husband and wife;

"2. Interspousal tort actions will destroy the harmony of the marital relationship;

"3. Retention of the doctrine will prevent collusive and fraudulent claims;

"4. Retention of the doctrine will guard against an increase in trivial claims;

"5. Divorce and criminal courts to furnish adequate redress;

"6. Change is solely within the purview of the Legislature.

*Id.* at 253–57, 462 A.2d at 511–13 (citations omitted).

The Court used a similar approach with respect to the decisions abrogating the doctrine, quoting liberally from some of them, it juxtaposed the answer of those courts to the reasons advanced by the retaining courts. Each of the concerns expressed by the now minority was addressed by one or more of the now majority decisions. For example, with respect to the first four reasons advanced for retaining the doctrine of interspousal immunity, the Court discussed the decision of the Supreme Court of Pennsylvania abrogating the doctrine completely:

"In *Hack v. Hack*, 495 Pa. 300, 433 A.2d 859 (1981), the Supreme Court of Pennsylvania declared that the social policy reasons traditionally given for immunizing a tortfeasor spouse from liability for his wrongs were:

"1. The unity of husband and wife

"2. The promotion of family harmony

"3. The prevention of collusive actions, and

"4. The avoidance of trivial claims.

"As to (1), the Court stated that the very purpose of Married Women's Acts was to abolish this concept of law; as to (2) the Court expressed the belief that an action in tort for negligence would be less likely to disturb family harmony than permitted causes of action for breach of contract or conversion that typically involve intentional wrongdoing; as to (3), the Court adopted the reasoning of the Court in *Immer v. Risko,* 56 N.J. 482, 267 A.2d 481, 488 (1970) that 'it seems unjust to deny the claims of the many because of the potentiality for fraud by the few'; and as to (4), the Court declared that the suggested avoidance of trivial claims is subject to the same analytical weakness as the argument regarding collusion. The Court concluded by saying "Having concluded that marital relationship alone may not deny a party redress for injury, we abolish the defense of interspousal immunity as a bar to suits in the courts of this Commonwealth.' (433 A.2d at page 869)."

*Boblitz, supra,* 296 Md. at 268–69, 462 A.2d at 519.

As an example of the response to the argument that there are alternative remedies to allowing interspousal tort actions, the Court offered the discussion of the issue by the Supreme Court of New Jersey when abrogating the doctrine of interspousal immunity:

"We add, on a closing note as to the existence of reason asserted for the continuation of the doctrine of interspousal immunity, that no court in this day and age subscribes seriously to the view that the abrogation of marital immunity for tortious injury is 'unnecessary' because redress for the wrong can be obtained through other means. This additional, 'alternative remedy' theory was advanced generations ago as a justification for retaining interspousal tort immunity in *Thompson v. Thompson,* 218 U.S. 611, el. [31 S.Ct.]111, 54 L.Ed. 1180 (1910) and was even then the

subject of dissent. The criminal law may vindicate society's interest in punishing a wrongdoer but it cannot compensate an injured spouse for her or his suffering and damages. Divorce or separation provide escape from tortious abuse but can hardly be equated with a civil right to redress and compensation for personal injuries."

*Id.* at 267, 462 A.2d at 518, quoting *Merenoff v. Merenoff,* 76 N.J. 535, 388 A.2d 951, 962 (1978) (citations omitted).

Finally, as to the sixth rationale for retaining the doctrine, namely, that it is a job for the Legislature, the Court offered as a response:

"*MacDonald v. MacDonald,* 412 A.2d 71 (Me.1980) discussed the principle of stare decisis as it applies to the doctrine of interspousal immunity, saying at page 74:

"In recent years, too, we have forcefully stated that in matters of torts involving the marital relationship we cannot 'stubbornly, hollowly and anachronistically' stay bound by the 'shackles' of the 'formalism' of the common law. *Moulton v. Moulton,* [309 A.2d 224,] 227 [ (1973) ]. We have also stressed that by so declaring, we do not undermine the principle of stare decisis. Rather, we prevent it from defeating itself; we do not permit it to mandate the mockery of reality and the 'cultural lag of unfairness and injustice', *Moulton v. Moulton, supra,* at 228, which would arise if the judges of the present, who like their predecessors cannot avoid acting when called upon, were required to act as captives of the judges of the past, restrained without power to break even those bonds so withered by the changes of the times that at the slightest touch they would crumble."

*Id.* at 265, 462 A.2d at 517.

As we did in *Lusby,* we noted that the legal scholars and commentators were in accord with the abrogation of the interspousal immunity doctrine and were near, if not completely, unanimous in that view. *Id.* at 270, 462 A.2d at 519–20. They offered, moreover, yet other voices in rebuttal to the arguments in favor of the doctrine's retention. *See* Harper &

James: The Law of Torts, Section 8.10 Vol. 1, p. 645 et seq.; Prosser Torts 4th Ed. H.B. (1978), pages 862–63. In addition, the Court pointed out that the Restatement Torts 2nd, Section 895F, consistent with the views of other commentators, *id.* at 272 n. 14, 462 A.2d at 520 n. 14, approved the abrogation of the interspousal immunity doctrine:

"Section 895F. Husband and Wife

"(1) A husband or wife is not immune from tort liability to the other solely by reason of that relationship.

* * *

"Comment:

"a. This Section rejects the immunity of one spouse from liability in tort to the other, which for a long time was the universal rule in English and American courts.

* * *

"f. Abrogation. The last two decades have witnesses the definite rejection and abolition of the immunity between husband and wife in its entirety in a substantial number of jurisdiction. Numerous courts have followed a dissenting opinion of Mr. Justice Harlan in *Thompson v. Thompson,* (1910) 218 U.S. 611, 31 S.Ct. 111, 54 L.Ed. 1180, and have held that the Married Women's Acts and the position of equality in which they were intended to place the spouses have removed all reason and justification for the immunity, and that one spouse is subject to liability to the other for any tort whether it is to property or to the person. The number of these decisions has been on the increase in recent years and has been encouraged by the spread and general use of liability insurance, particularly in automobile cases. The indications are clear that this is the future state of the laws in all states . . . . "

*Id.* at 271–72, 462 A.2d at 520.

With respect to the question of the soundness of the foundation on which our prior cases addressing interspousal immunity rest, sharing the conclusion reached by Judge Smith upon

his completion of his earlier examination of that foundation in *Lusby*, the Court opined that "[i]t is fair to say that his examination demonstrated that the foundation was resting on sand." *Id.* at 272, 462 A.2d at 521. Then, having stated that it shares the view of the majority of the courts, "that the interspousal immunity rule is unsound in the circumstances of modern life in such cases as the subject" and that the reasons advanced for its viability do not, and can not survive careful scrutiny, *id.* at 273, 462 A.2d at 521, the Court turned to a consideration of whether stare decisis was an impediment to the abrogation of the doctrine. In concluding that it was not, in addition to acknowledging and emphasizing " 'that it is our duty to determine the common law as it exists in this State,' " *id.* at 274, 462 A.2d at 522, quoting *Pope v. State*, 284 Md. 309, 342, 396 A.2d 1054, 1073 (1979), and that " '[t]he doctrine of stare decisis, important as it is, is not to be construed as preventing us from changing a rule of law if we are convinced that the rule has become unsound in the circumstances of modern life,' " *id.*, quoting *White v. King*, 244 Md. 348, 354, 223 A.2d 763, 767 (1966), we were emphatic:

> "In cases such as the present we have no legislative barrier to abrogation of this outmoded rule of law. Indeed, after legislative passage and approval by the people of Article 46 of the Declaration of Rights any ancient deprivation of rights based upon sex would contravene the basic law of this State."

*Id.* at 274–75, 462 A.2d at 522.

As we have seen, despite the expansive historical review, the painstaking and exhaustive analysis, and survey, of the status of the law with respect to interspousal immunity throughout the country, including the widespread criticism of the doctrine attending the debate on its continued viability and the enthusiastic endorsement by the majority of courts of the view that interspousal immunity, a vestige of the past, being unsound in the circumstances of modern life, has outlived its usefulness, if ever it had any, the Court did not fully abrogate the doctrine. Rather, it limited its holding, abrogating the interspousal immunity rule in this State only as to cases

sounding in negligence. *See also* Doe, 358 Md. at 120, 747 A.2d at 620. ("In *Boblitz v. Boblitz,* 296 Md. 242, 273, 462 A.2d 506, 521 (1983), where the Court did change the common law by abrogating interspousal immunity in negligence cases, we reiterated the limited nature of the *Lusby* holding with regard to intentional torts."). Thus, surveying the landscape of the law in Maryland with respect to interspousal immunity in tort actions reveals that there is and, unless the doctrine is abrogated, there will remain a huge gap between spouses who can sue their spouses and those who cannot. On the one hand, as a result of this Court's *Lusby* decision, a wife, for example, may sue her husband for an intentional tort committed against her, and recover, provided she can prove that the tort committed against her by her husband was both intentional and sufficiently "outrageous" as to meet the standard established by *Lusby.* On the other hand, perhaps the polar opposite situation, this Court, by abrogating, in *Boblitz,* the interspousal immunity doctrine in negligence cases, has permitted a spouse injured as a result of the negligence of his or her spouse to now sue that spouse. There is, however, a broad spectrum of tort actions between the *Lusby* and *Boblitz* situations, some characterized as offensive and/or harmful conduct, albeit not rising to the level of outrageousness required by *Lusby,* that remains immune from civil suit. The question to be answered, therefore, and, indeed, as we have seen, that the petitioner posits is whether those torts, and the conduct that characterizes them, that fall in the gap created by *Lusby* and *Boblitz* should be subject to the immunity defense or whether, on the contrary, the time has come to bridge that gap. In addition to the analysis already conducted, including the review of the status of the immunity doctrine in the other States, whether the arguments in support of immunizing such conduct between spouses withstand scrutiny and justify barring meritorious claims will also inform our decision.

As a threshold matter, we shall update the *Boblitz* survey of the status of the interspousal immunity doctrine in this country. *Boblitz* observed that, at that time, thirty-five States had

abrogated the doctrine, either partially or fully, and only twelve States continued to recognize the doctrine. In the twenty-years since *Boblitz*, the trend in favor of abrogation and away from the doctrine has not abated. Now, nine of the twelve States that recognized the doctrine in 1983 have completely abrogated the doctrine by court decision. See, *Waite v. Waite*, 618 So.2d 1360 (Fla.1993); *Flagg v. Loy*, 241 Kan. 216, 734 P.2d 1183 (1987); *Burns v. Burns*, 518 So.2d 1205 (Miss.1988); *S.A.V. v. K.G.V.*, 708 S.W.2d 651 (Mo.1986) (negligence claims); *Townsend v. Townsend*, 708 S.W.2d 646 (Mo. 1986) (intentional torts); *Miller v. Fallon County*, 222 Mont. 214, 721 P.2d 342 (1986); *Shearer v. Shearer*, 18 Ohio St.3d 94, 480 N.E.2d 388 (1985); *Heino v. Harper*, 306 Or. 347, 759 P.2d 253 (1988); *Davis v. Davis*, 657 S.W.2d 753 (Tenn.1983); *Tader v. Tader*, 737 P.2d 1065 (Wyo.1987). Another of those states, Hawaii, has done so by statute, see Haw.Rev.Stat. 572–28 (1993). The remaining two states have abrogated the doctrine in part. See, *Beattie v. Beattie*, 630 A.2d 1096 (Del.1993) (negligence claims); *Jones v. Jones*, 259 Ga. 49, 376 S.E.2d 674 (1989) (wrongful death actions).[9]

Moreover, of the eight states that we identified in *Boblitz* as having partially abrogated the doctrine, two, one by court decision, *Price v. Price*, 732 S.W.2d 316 (Tex.1987), and one by statute, Va.Code Ann. 8.01–220.1 (Michie 1986), now have fully abrogated the doctrine. By our count, therefore, no less than forty-six States have abrogated the doctrine, either fully or partially, leaving only four States still retaining it. See Appendix A.

On two occasions in the last twenty-five years, this Court has done an analysis of the interspousal immunity doctrine and its rational underpinnings, the reasons or justification

---

**9.** Georgia has codified the interspousal immunity doctrine. Ga Code Ann. § 19–3–8 (2002) provides:

"Interspousal tort immunity, as it existed immediately prior to July 1, 1983, shall continue to exist on and after July 1, 1983."

The Supreme Court of Georgia, in *Jones v. State*, 157 Ga.App. 163, 276 S.E.2d 674, 676 (1989) held the statute unconstitutional, as applied to actions for wrongful death.

offered for its existence and continued viability, and, on each occasion, found the doctrine and the foundation on which it was built to be lacking. We found the trend and, indeed, the great weight of authority, to be to move away from the doctrine and in favor of changing the common law to abolish it, either fully or partially. The majority of the States, we discovered, were of the view that the doctrine was outdated and served no useful purpose, that "there presently exists no cogent or logical reason why the doctrine of interspousal tort immunity should be continued." *Merenoff,* 388 A.2d at 962. As we have seen, this Court, in *Boblitz* expressed its adherence to this majority view, characterizing the doctrine as "unsound in the circumstances of modern life" and "a vestige of the past," for which "the reasons asserted for its retention do not survive careful scrutiny." 296 Md. at 273, 462 A.2d at 521. We continue of that view and, the trend toward abrogation having continued and the weight of authority having grown larger, we are fortified in that view.

As indicated, the respondent offers arguments in support of the retention of the interspousal immunity doctrine or which she hopes will stay our hand, in deference to the Legislature. We will address each such argument in turn.

At the outset, the respondent acknowledges that "there are of course vestiges of the common law concept upon which interspousal tort immunity was based which remain with us today." (Respondent's Brief at 3). As examples, she refers to Md.Code, (1974, 2003 Repl.Vol.) § 4–108(b) of the Real Property Article permitting a wife and husband to take and hold property as tenants by the entireties, immune from the creditors of an individual spouse, Md.Code (2002 Repl. Vol) §§ 9–105 and 9–106 of the Courts and Judicial Proceedings Article, protecting spouses from disclosing communications made to each other during the marriage in a court proceeding, federal and state tax laws allowing married couples to file joint income tax returns, Md.Code, (1974, 2001 Repl.Vol.) § 3–203 of the Estates and Trusts Article, pertaining to the right of a spouse to inherit from a deceased spouse's estate, notwithstanding a contrary direction in the will and various provisions of the

Family Law Article, dealing with alimony, equitable distribution of marital assets, annulment and divorce. The respondent concludes:

"To assert that a husband and wife should be treated for all purposes [as] if he or she were unmarried would be an absurd proposition. That an individual who is married is treated by the law in many respects differently than an unmarried individual is ingrained in our society and its laws. The doctrine of interspousal immunity, as restricted by *Lusby* ... and modified by *Boblitz* ... is a vital corollary to the marriage relationship and the status of Maryland's divorce laws. Moreover, the doctrine does not run afoul of Article 46 of the declaration of Rights (Equal Rights Amendment) as the doctrine applies equally to husband and wife."

The respondent's point that married individuals are treated in many respects differently than single persons and, in fact, is ingrained in our law, we think, must be conceded. But having done so, it is difficult to see how it helps her. A similar point was made by the dissenting justice in *Luna v. Clayton*, 655 S.W.2d 893 (Tenn.1983), in which the Tennessee Supreme Court refused to allow the immunity defense in a wrongful death action. Justice Harbison expressed the opinion that:

"The institution of marriage will [not] come to an end or be irreparably damaged by permitting tort actions, intentional or negligent. Those who state that married persons are not in a different status from others, however, in my opinion are in error and need only examine the numerous statutes in this state on the subject."

*Id.* at 898–99. The majority in *Davis v. Davis*, 657 S.W.2d 753, 757 (Tenn.1983), which abrogated the interspousal immunity doctrine in Tennessee fully, expressed agreement with both propositions, but observed, "the fact that married persons are in a different status from others is not sufficient to conceal interspousal immunity from judicial scrutiny." We agree with that observation.

Next, relying on the dissenting opinion in *Boblitz*, 296 Md. at 287–288, 462 A.2d at 527 (Couch, J. dissenting), the respondent urges this Court not to place too much emphasis on the decisions of our sister jurisdictions. Noting the passage, referenced in the dissent, from *Guffy v. Guffy*, 230 Kan. 89, 631 P.2d 646, 648–49 (1981), in which that court commented that "the decisions [from other States] are based upon the decisional law, the statutory law and the public policy for each respective state," she concludes that the "interplay between interspousal tort immunity and a particular state's divorce laws is critical to any decision to abrogate the doctrine."

We agree that the decisions of our sister jurisdictions are not binding on this Court and ought not dictate the course of jurisprudence in the State of Maryland. This does not mean that their decisions may not be considered, however. While not binding, they may be persuasive authority. As we did in *Boblitz*, and have always done, we have, in this case, simply analyzed the arguments both in support of, and against, retention of the interspousal immunity rule, accepting that, which to us was most persuasive. We have not given undue weight to that case law.

The respondent argues that alternative remedies, already provided by the courts, are adequate for "garden-variety intentional torts between spouses" that do not fit within our *Boblitz* and *Lusby* holdings. In particular, the respondent emphasizes that Maryland is a marital property State, in which equity, rather than title controls property distribution. She also notes that the statutory scheme provides for the consideration of eleven factors when the equities and rights of the parties are being adjusted, and asserts that tortious conduct may be considered in granting alimony or making a monetary award. In addition, the respondent points to the domestic violence provisions of the Family Law Article, Md. Code (1984, 1999 Repl.Vol., 2002 Supp.) §§ 4–501–4–516, noting that they permit, at the *ex parte* stage, the court to order the offending spouse from the home and grant custody of the children and, at the protective order hearing, the court to order custody, exclusive use and possession of the family

home, spousal support, etc., for up to one year. Finally, the respondent states that the aggrieved spouse has the benefit of the criminal law; he or she may charge the offender and seek restitution for any medical treatment required.

This argument has been rejected, as *Boblitz,* reported. The court, in *Brown v. Brown,* 88 Conn. 42, 89 A. 889, 891 (1914), made the point that "when a wife is allowed to possess and deal with her own property and carry on business in her own name as a *feme sole,* she ought to have the same right to contract and enforce her contracts, and the same remedies for injuries to her person and property which others have and to be liable upon her contracts and for her torts the same as others are." Also, *Merenoff v. Merenoff,* 76 N.J. 535, 388 A.2d 951, 962 (1978) rebuts the alternative remedies argument, noting that while divorce dissolves the marriage, thereby preventing future tortious abuse, that is not the same as civil redress or compensation for personal injuries and that the criminal law's vindication of society's interest in punishing wrongdoers does not compensate a spouse for injuries and suffering. The "remedies" the respondent proffers are, in the same sense, not compensation for tort damages.

 The rule of stare decisis,[10] the respondent submits, militates against the abrogation of interspousal immunity. Not only does it promote certainty and stability, but she says, citing *Harrison v. Montgomery County,* 295 Md. 442, 456 A.2d 894 (1983), for those reasons, the change in decisional doctrine should be left to the Legislature. Moreover, the respondent maintains, the Legislature has spoken on the subject of interspousal immunity. It did so, she asserts, when it recodified the Married Women's Act, as subsequently amended, as Md. Code (1984, 1999 Repl.Vol., 2002 Supp.) § 4–203 and § 4–204 of the Family Law Article. Pointing out that § 4–204(5) provides that a married woman may "sue on any contract,

---

10. Blacks Law Dictionary defines stare decisis as:
 "[Latin "to stand by the thing decided"] The doctrine of precedent, under which it is necessary for a court to follow earlier judicial decisions when the same points arise again in litigation."

including a contract made with her husband," while § 4–204(7), pertaining to the right of a married woman to sue for torts committed against her, provides only that she may "sue for any torts committed against her," without referring to the right to sue her husband, the respondent argues that it is clear, applying the rules of statutory construction, that "while a married woman can sue her husband on a contract with him, she cannot sue him for a[n] [intentional tort] committed against her."

In arguing that any change in the immunity rule should come from the Legislature, the respondent quotes from *Boblitz,* as to the importance of stare decisis:

> "We are mindful of the value of the doctrine of stare decisis and aware that for reasons of certainty and stability, changes in decisional doctrine ordinarily should be left to the legislature."

*Boblitz, supra,* 296 Md. at 273, 462 A.2d at 521, citing *Harrison v. Montgomery County,* 295 Md. 442, 456 A.2d 894. Skipping then the immediately succeeding text after the attribution, however, the respondent cites to the *Boblitz* dissent for the proposition that:

> "... that for over a half century, this Court has periodically concerned itself with the concept of interspousal immunity and has consistently refused by judicial fiat, to abrogate the rule, leaving it to the Legislature to deal with according to its perception of public policy."

What the respondent skipped is important and quite instructive. Despite the general statement relating to legislative deference and the "value of the doctrine of stare decisis," we, also, said:

> "[Deferring to legislative action] is particularly true in cases such as *Harrison, supra,* where the Legislature repeatedly had rejected efforts to achieve legislatively that which we were asked to grant judicially. Moreover, in *Harrison* the requested change from 'contributory negligence' to 'comparative negligence' required selection from several forms of the latter doctrine—each productive of markedly differing

effects upon the rights and obligations of all parties in negligence litigation.

*"Nonetheless, as we have pointed out in Harrison, supra, 'we have never construed the doctrine of stare decisis to inhibit us from changing or modifying a common law rule by judicial decision where we find, in light of changed conditions or increase knowledge that the rule has become so unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people."* '

*Boblitz, supra,* 296 Md. at 274, 462 A.2d at 521–522, citing *Harrison v. Montgomery County,* 295 Md. at 459, 456 A.2d at 903 (Emphasis added). Our explanation for our departure from stare decisis to partially abrogate the interspousal immunity rule was a critical part of our analysis. In fact, we relied on the reasoning of other courts when faced with the same issue. *Id.* at 265, 462 A.2d at 517 citing *Brown v. Gosser,* 262 S.W.2d 480, 484 ("[Stare decisis] is not a universal, inexorable command. The instances in which the court has disregarded its admonition are many"); *MacDonald v. MacDonald, supra,* 412 A.2d at 74 ("[W]e do not permit [stare decisis] to mandate the mockery of reality and the 'cultural lag of unfairness and injustice' ").

We recently addressed stare decisis in *Perry v. State,* 357 Md. 37, 96–100, 741 A.2d 1162, 1194–1195 (1999):

"The Supreme Court has stated that 'it is common wisdom that the rule of stare decisis is not an 'inexorable command,' and certainly it is not such in every constitutional case.' *Planned Parenthood v. Casey,* 505 U.S. 833, 854, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992).

"Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. Adhering to precedent is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than it be settled right. Nevertheless, when governing decisions are unworkable or

are badly reasoned, this Court has never felt constrained to follow precedent. Stare decisis is not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision. [Citations omitted] [Internal quotation omitted.] *Payne v. Tennessee*, 501 U.S. 808, 827–28, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991).

"This Court also noted that, although important, the rule of stare decisis is not an absolute:

"It is a well recognized and valuable doctrine that decisions, once made on a question involved in a case before a court, should not thereafter be lightly disturbed or set aside (except by a higher court). This is because it is advisable and necessary that the law should be fixed and established so far as possible, and the people guided in their personal and business dealings by established conclusions, not subject to change because some other judge or judges think differently.

"On the other hand, it is sometimes advisable to correct a decision or decisions wrongly made in the first instance, if it is found that the decision is clearly wrong and contrary to other established principles."

Strict adherence to the doctrine of stare decisis would severely limit a court's ability to decide disputes, even in cases where the applicable guiding law had been decided incorrectly, or, in times of changed social circumstance. Under such a strict application of stare decisis, the United States Supreme Court would have to have deferred to Congressional action because it would have been powerless to end segregation in public education, *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), with the result that the judicially created doctrine of "separate but equal," *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), would have continued to be the law.

To be sure, the respondent does not dispute that this Court has the power and authority to abrogate the common law rule, she disputes only whether it is wise for this Court to do so.

(Respondent's Brief at 14). We disagree with the respondent on this point, believing that it is eminently wise of this Court to abrogate a doctrine that is "a vestige of the past [and] no longer suitable to our people."

With respect to the statutory construction argument, it was rejected in *Boblitz,* if not directly, certainly by implication. *See Boblitz, supra,* 296 Md. at 274, 462 A.2d at 522 ("[W]e have no legislative barrier to abrogation of this outmoded rule of law.").

The respondent acknowledges, as she must, that *Boblitz* "represented a significant exception to the doctrine of inter-spousal immunity." She proffers, however, that it should not be used as a springboard for the abrogation of the doctrine in its entirety. Abrogation of the doctrine for negligence claims, made sense, the respondent concedes, both in the context of facts of the case and generally. As to the former, the respondent points to the fact that Maryland requires compul-sory insurance to a minimum amount and provides a fund for drivers injured by uninsured drivers and acknowledges that it would be fundamentally unfair to deny recovery to a person injured in an automobile accident as a result of negligence solely because the negligent person was the injured person's spouse. As to the latter, the respondent notes that there exists insurance coverage for other forms of negligence. In addition, she recognizes that an action by one spouse against the other for negligence will have little, if any, impact, on either the marriage or a subsequent divorce. The opposite is true, the respondent argues, when an intentional tort is in-volved. There is no insurance available, she asserts and, also, the interplay between the intentional conduct and subsequent or preceding divorce proceedings is problematic. Having proffered questions that this interplay may spawn, the respon-dent concludes:

> "These questions and many more undoubtedly will arise if the doctrine is abrogated in its entirety. To say nothing of the proliferation of litigation between the spouses which surely would ensue. And where does it end? It is foresee-able that suits for malicious prosecution or civil abuse of

process emanating from unsuccessful petitions for *ex parte* relief, protective order hearings or unsuccessful domestic criminal prosecutions would skyrocket. If the volume of exparte petitions, protective order hearings, domestic criminal prosecutions and divorce filings in this State are any indication, the abrogation of the doctrine surely would drastically increase the litigation between embittered spouses. A proliferation of appeals certainly would follow."

We are not convinced. It has been held that "insofar as interspousal liability for tort is concerned there is no logical or legal reason for drawing a distinction between the two." *Klein v. Klein,* 58 Cal.2d 692, 26 Cal.Rptr. 102, 376 P.2d 70, 71 (1962). *See Beattie v. Beattie,* 630 A.2d 1096, 1101 ("[I]t appears that the rationale underlying the abrogation of the Doctrine in the context of negligence actions would apply to intentional torts."). *See also Price v. Price,* 732 S.W.2d 316, 319–320 (Tex.1987), expressing concern that partial abrogation of the doctrine, which would leave in place a bar to other actionable torts that would not exist in the case of unmarried persons, would amount to a repudiation of the state constitutional guarantee of equal protection of the laws.

In any event, California abrogated the doctrine in intentional tort cases in 1962. The respondent has not provided any demonstrative evidence that any of the questions or problems she posits as possible and, indeed, "undoubtedly will arise" have arisen in California or any where else for that matter. Moreover, the other States that have fully abrogated the doctrine or in cases of intentional torts, some quite a long time ago, e.g. *Brown v. Brown, supra,* 88 Conn. 42, 89 A. 889 (1914); *Gilman v. Gilman,* 78 N.H. 4, 95 A. 657 (N.H.1915); *Crowell v. Crowell,* 180 N.C. 516, 105 S.E. 206 (1920); *Penton v. Penton,* 223 Ala. 282, 135 So. 481 (1931); *Pardue v. Pardue,* 167 S.C. 129, 166 S.E. 101 (1932), provide an accurate barometer of what can be expected after abrogation and what they reveal is far different from the picture the respondent paints.

The overwhelming weight of authority supports the petitioner's argument that the interspousal immunity doctrine should

be abrogated. Joining the many of our sister States that have already done so, we abrogate the interspousal immunity rule, a vestige of the past, whose time has come and gone, as to all cases alleging an intentional tort. As we did in *Boblitz*, 296 Md. at 275, 462 A.2d at 522, we shall apply the abrogation to this case and to all causes of action accruing after the date of the filing of this opinion.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT, WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND REMAND THE CASE TO THAT COURT FOR PRO-CEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPE-CIAL APPEALS TO BE PAID BY THE RESPONDENT.

### APPENDIX A

Present status of the Interspousal Immunity Rule in 49 States other than Maryland; in the District of Columbia; and in Admiralty

| | |
|---|---|
| Alabama | Penton v. Penton, 223 Ala. 282, 135 So. 481 (1931) (Rule fully abrogated) |
| Alaska | Cramer v. Cramer, 379 P.2d 95 (1963) (Rule fully abrogated) |
| Arizona | Fernandez v. Romo, 132 Ariz. 447, 646 P.2d 878 (1982) (Rule fully abrogated) |
| Arkansas | Leach v. Leach, 227 Ark. 599, 300 S.W.2d 15 (1957) (Rule fully abrogated) |
| California | Klein v. Klein, 58 Cal.2d 692, 26 Cal.Rptr. 102, 376 P.2d 70 (1962) (Rule fully abrogated) |
| Colorado | Rains v. Rains, 97 Colo. 19, 46 P.2d 740 (1935) (Rule fully abrogated) |
| Connecticut | Brown v. Brown, 88 Conn. 42, 89 A. 889 (1914) (Rule fully abrogated) |
| Delaware | Beattie v. Beattie, 630 A.2d 1096 (1993) (Rule abrogated as to negligence actions) |
| Florida | Waite v. Waite, 618 So.2d 1360 (1993) (Rule fully abrogated) |
| Georgia | Jones v. Jones, 259 Ga. 49, 376 S.E.2d 674 (1989) (Rule abrogated as to wrongful death actions) |
| | Rule acknowledged and sustained by statute. See Ga. Ann.Code § 19-3-8 (2002) |

| | |
|---|---|
| Hawaii | Haw.Rev.Stat. 572–28 (1993)<br>(Rule fully abrogated) |
| Idaho | Lorang v. Hays, 69 Idaho 440, 209 P.2d 733 (1949)<br>(Rule abrogated as to intentional torts) |
| | Rogers v. Yellowstone Park Co., 97 Idaho 14, 539 P.2d 566 (1975)<br>(Rule abrogated as to motor torts) |
| Illinois | 750 Ill. Comp. Stat. 65/1 (2003)<br>(Rule fully abrogated) |
| Indiana | Brooks v. Robinson, 259 Ind. 16, 284 N.E.2d 794 (1972)<br>(Rule fully abrogated) |
| Iowa | Shook v. Crabb, 281 N.W.2d 616 (1979)<br>(Rule abrogated for all personal injury actions) |
| Kansas | Flag v. Loy, 241 Kan. 216, 734 P.2d 1183 (1987)<br>(Rule fully abrogated) |
| Kentucky | Brown v. Gosser, 262 S.W.2d 480 (1953)<br>(Rule fully abrogated ) |
| Louisiana | Smith v. Southern Farm Bureau, 247 La. 695, 174 So.2d 122 (1965)<br>(Because of the competing effect of two statutes, (Article 2315 and LSA RS 9:291) has a cause of action but no remedy to enforce it) |
| Maine | MacDonald v. MacDonald, 412 A.2d 71 (1980)<br>(Rule fully abrogated) |
| Massachusetts | Brown v. Brown, 381 Mass. 231, 409 N.E.2d 717 (1980)<br>(Rule abrogated for all personal injury actions) |
| | Lewis v. Lewis, 370 Mass. 619, 351 N.E.2d 526 (1976)<br>(Rule abrogated as to motor torts) |
| Michigan | Hosko v. Hosko, 385 Mich. 39, 187 N.W.2d 236 (1971)<br>(Rule fully abrogated) |
| Minnesota | Beaudette v. Frana, 285 Minn. 366, 173 N.W.2d 416 (1969)<br>(Rule fully abrogated prospectively) |
| Mississippi | Burns v. Burns, 518 So.2d 1205 (1985)<br>(Rule fully abrogated) |
| Missouri | Townsend v. Townsend, 708 S.W.2d 646 (1986)<br>(Rule abrogated as to intentional torts) |
| | S.A.V. v. K.G.V., 708 S.W.2d 651 (1986)<br>(Rule abrogated as to negligence actions) |
| Montana | Miller v. Fallon County, 222 Mont. 214, 721 P.2d 342 (1986)<br>(Rule fully abrogated) |
| Nebraska | Imig v. March, 203 Neb. 537, 279 N.W.2d 382 (1979)<br>(Rule fully abrogated) |
| Nevada | Rupert v. Steinne, 90 Nev. 397, 528 P.2d 1013 (1974) |

(Rule abrogated as to motor torts)

| | |
|---|---|
| New Hampshire | Gilman v. Gilman, 78 N.H. 4, 95 A. 657 (1915) (Rule fully abrogated) |
| New Jersey | Merenoff v. Merenoff, 76 N.J. 535, 388 A.2d 951 (1978) (Rule fully abrogated) |
| New York | State Farm Mut. Auto. Ins. Co. v. Westlake, 35 N.Y.2d 587, 364 N.Y.S.2d 482, 324 N.E.2d 137 (1974) (Rule fully abrogated) |
| New Mexico | Maestas v. Overton, 87 N.M. 213, 531 P.2d 947 (1975) (Rule fully abrogated) |
| North Carolina | Crowell v. Crowell, 180 N.C. 516, 105 S.E. 206 (1920) (Rule fully abrogated) |
| North Dakota | Fitzmaurice v. Fitzmaurice, 62 N.D. 191, 242 N.W. 526 (1932) (Rule fully abrogated) |
| Ohio | Shearer v. Shearer, 18 Ohio St.3d 94, 480 N.E.2d 388 (1985) (Rule fully abrogated) |
| Oklahoma | Courtney v. Courtney, 184 Okla. 395, 87 P.2d 660 (1938) (Rule fully abrogated) |
| Oregon | Heino v. Harper, 306 Or. 347, 759 P.2d 253 (1988) (Rule fully abrogated) |
| Pennsylvania | Hack v. Hack, 495 Pa. 300, 433 A.2d 859 (1981) (Rule fully abrogated) |
| Rhode Island | Digby v. Digby, 120 R.I. 299, 388 A.2d 1 (1978) (Rule abrogated as to motor torts) |
| | Asplin v. Amica Mut. Ins. Co., 121 R.I. 51, 394 A.2d 1353 (1978) (Rule abrogated where death of either spouse intervenes tortious act and commencement of suit) |
| South Carolina | Pardue v. Pardue, 167 S.C. 129, 166 S.E. 101 (1932) (Rule fully abrogated) |
| South Dakota | Scotvold v. Scotvold, 68 S.D. 53, 298 N.W. 266 (1941) (Rule fully abrogated) |
| Tennessee | Davis v. Davis, 657 S.W.2d 753 (1983) (Rule fully abrogated) |
| Texas | Price v. Price, 732 S.W.2d 316 (1987) (Rule fully abrogated) |
| Utah | Stoker v. Stoker, 616 P.2d 590 (1980) (Rule fully abrogated) |
| Vermont | Richard v. Richard, 131 Vt. 98, 300 A.2d 637 (1973) (Rule abrogated as to motor torts) |
| Virginia | Va Code Ann. 8.01–220.1 (Michie 1986) (Rule fully abrogated) |
| Washington | Freehe v. Freehe, 81 Wash.2d 183, 500 P.2d 771 (1972) |

**500**

(Rule fully abrogated)

West Virginia Coffindaffer v. Coffindaffer, 161 W.Va. 557, 244 S.E.2d 338 (1978) (Rule fully abrogated)

Wisconsin Wait v. Pierce, 191 Wis. 202, 209 N.W. 475 (1926) (Rule fully abrogated)

Wyoming Tater v. Tater, 737 P.2d 1065 (1987) (Rule fully abrogated)

District of Columbia D.C.Code § 30–201 (1976) (Rule fully abrogated)

Admiralty Byrd v. Byrd, 657 F.2d 615 (4th Cir.1981) ("Interspousal immunity is a doctrine whose day has come and gone," p. 621)